# EXHIBIT 5
# (REDACTED)

## REDACTED VERSION OF DOCUMENT FILED UNDER SEAL

# In The Matter Of:
## *Illumina Inc v. BGI Genomics*

### David Blackburn, PH.D.
### April 22, 2020
### CONFIDENTIAL - ATTORNEYS' EYES ONLY



Min-U-Script® with Word Index

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**

1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

ILLUMINA INC, and
ILLUMINA CAMBRIDGE LTD.,

       Plaintiffs,

   v.                        Case No.
                               3:20-cv-01465-WHO

BGI GENOMICS CO., LTD,
BGI AMERICAS CORP,
MGI TECH CO., LTD,
MGI AMERICAS INC., and
COMPLETE GENOMICS INC.,

       Defendants.
_____)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF DAVID BLACKBURN, PH.D.

APPEARING REMOTELY FROM

WASHINGTON, D.C.


April 22, 2020

10:30 a.m.



Reported by:   Lori J. Goodin, RPR, CLR, CRR,

RSA, California CSR #13959

APPEARING REMOTELY FROM WASHINGTON, D.C.

Job No:   2020-84545

Case 3:19-cv-03770-WHO   Document 239-11   Filed 09/02/20   Page 4 of 18
David Blackburn, PH.D. - April 22, 2020
CONFIDENTIAL - ATTORNEYS' EYES ONLY

49

```
 1  BY MR. REINES:
 2       Q.   Is it on your screen?
 3       A.   Well, my screen timed out, so now I
 4  can't see anything on my screen, so it is just
 5  black.
 6       Q.   Pardon me.  In terms of the cost of
 7  sequencing, from Illumina, going down, how do you
 8  distinguish whether the extent of that is from
 9  price competition with competitors versus other
10  factors?
11       A.   Well, I think in the first instance
12  you would look at what happens to the prices of
13  the equipment.
14            If the gene sequencing price is
15  going down, but the price of the equipment is
16  unchanged, then, you know, I don't think there
17  is -- then there is no price erosion.  Right?
18            You haven't even had price erosion.
19  Prices are the same.  The throughput is
20  increasing.  Technology is improving and that is
21  what is driving the price of sequencing down.
22            But, if you have prices of the
23  equipment changing, you know, there is a lot of
24  different ways you can do it.
25            It is going to depend on the
```

50

1  particulars in the case, you know, two years from
2  now or a year and a half from now or whenever we
3  are at trial and what has come up in discovery.
4           But, in general, you are going to
5  take advantage of differences in competition.
6           So, again these are all
7  possibilities.  I don't know what the right
8  approach would be.
9           But, one possibility is you would
10 look at customers where there is direct
11 competition versus customers where there is not
12 direct competition.
13          You might make, you might need to --
14 you know, that could be done on sort of customer
15 by customer basis, particularly if there is not
16 many customers that defendants compete for.
17          There are econometric techniques
18 that you can use, linear regression and things
19 like that, where you can suss out -- you know,
20 you can measure different changes in the market
21 and use those to differentiate which of those are
22 driving changes in prices over time.
23          I mean, like I said, I don't know
24 which one is going to be the right approach.
25          But, those are the sorts of things

Case 3:19-cv-03770-WHO   Document 239-11   Filed 09/02/20   Page 6 of 18
David Blackburn, PH.D. - April 22, 2020
CONFIDENTIAL - ATTORNEYS' EYES ONLY

51

1  you would look at or you would consider at least
2  as the way to go.
3              Again, that is establishing -- that
4  is assuming there is price erosion.  Again, there
5  might not be.  But, again, we will know.
6         Q.   When you say we will know, is that
7  using one of those methods that you have just
8  described?
9         A.   Yeah, I mean, that is not an
10 exhaustive list.  Those are the two that jump to
11 mind as potential approaches.
12             But, yeah, it might be those.  It
13 might be something similar.  It might be
14 something -- it might be something else that is
15 not popping in my head right now.
16             But, distinguishing, first
17 identifying whether or not there are price
18 changes or price drops.
19             And then distinguishing whether
20 those are due to competition from what is
21 ultimately held to be patent infringement or due
22 to other factors is, you know, sort of run of the
23 mill stuff for calculating damages and
24 calculating price erosion.
25        Q.    Okay.  Good.

Case 3:19-cv-03770-WHO   Document 239-11   Filed 09/02/20   Page 7 of 18
David Blackburn, PH.D. - April 22, 2020
CONFIDENTIAL - ATTORNEYS' EYES ONLY

71

1  is something that you could look on a
2  case-by-case basis, particularly in this case
3  where we are going to have, by all
4  specifications, only a small number of places
5  where defendants are seeking to compete.
6           That you could then do something
7  similar and look on a case-by-case basis to
8  identify price erosion.
9      Q.   And that is the assumption that --
10     A.   Part of everything that I spoke
11 before, about how one would calculate price
12 erosion then.
13     Q.   And is it your belief that the only
14 instances of price erosion would be where the
15 infringing product is actually being considered
16 by the purchaser?
17          MS. SCOTT:  Objection, vague.
18          THE WITNESS:  No, I don't think I
19 said that.
20 BY MR. REINES:
21     Q.   Okay.  What are the circumstances in
22 which you would expect to see price erosion based
23 on the many price erosion opinions that you have
24 given, outside of a customer that is actively
25 considering both products?

72

1     MS. SCOTT:  Objection.
2     THE WITNESS:  Well, we could see
3  what happens.  So, trying to predict or expect
4  is -- you know, there is no point in that.
5     We will see what happens.  But, what
6  might happen, for example, is Illumina might
7  decide that they are going to lower prices across
8  the board because of competition.
9     From everything that I understand,
10  there is a pricing committee at Illumina that has
11  regular meetings and talks about pricing of
12  products.
13     And if they are going to lower
14  prices across the board even to customers who are
15  not approaching Illumina and saying that there is
16  an alternative that they are thinking about
17  turning to, that that would show up in
18  discussions and decisions made by the pricing
19  committee.
20     So, that would be one place to look
21  to see whether that sort of thing happened.
22     But, again, we will see.
23  BY MR. REINES:
24     Q.    What would be the other places to
25  look?

Case 3:19-cv-03770-WHO   Document 239-11   Filed 09/02/20   Page 9 of 18
David Blackburn, PH.D. - April 22, 2020
CONFIDENTIAL - ATTORNEYS' EYES ONLY

73

1    A.    I don't know.  We will see when,
2  when it happens.  We will see how it happens, but
3  that is the obvious place to look to me.
4    Q.    And would you expect customers that
5  are not seriously considering purchasing a
6  competing system to use the fact of the competing
7  system in the market in an individualized
8  negotiation?
9         MS. SCOTT:  Objection, vague.
10        THE WITNESS:  I mean, I wouldn't
11 expect it one way or another.  They might or they
12 might not.
13        Again, we will see it in the data.
14 We will see it in the documentation.  We will be
15 able to look at the pricing.  Again, whether it
16 is through econometric analyses or case-by-case
17 analyses or some combination of the two or some
18 other approach, to be able to identify what has
19 happened to prices and why that has happened.
20 BY MR. REINES:
21   Q.    And what is the other competing
22 approach, other than econometrics and case by
23 case?
24   A.    I mean, I would just refer to you
25 the previous answer.  Those are the two that jump

74

1  out to me right now.
2          But, I don't want to close off the
3  possibility, if this trial moves forward, if the
4  defendants enter, that those are the only two
5  possible approaches.
6      Q.   I'm just asking you as someone --
7  you say you have done many price erosion
8  analyses.  What other analysis have you used,
9  other than case by case and econometrics?
10     A.   I mean, those are -- I don't know
11 that there is more that I have done.  But, again,
12 it is like, it has been a long time, so I don't
13 know.
14     Q.   What do you mean it has been a long
15 time?  When is the last time you did a price
16 erosion analysis?
17     A.   I mean, I have been doing them for
18 years.  So, if I did something 11 years ago, I
19 don't know, I don't remember.
20     Q.   The only two methods you can
21 identify right now is, for the calculation of
22 price erosion is case by case or econometrics or
23 a hybrid of both.  Is that correct?
24     A.   As I sit here right now, yeah, I
25 think that is correct.

75

```
 1        Q.    And econometrics you refer to linear
 2   regressions; is that correct?
 3        A.    I did.
 4        Q.    Any other techniques you would use
 5   in the econometrics method that you are referring
 6   to?
 7        A.    I don't think so.  I mean that tends
 8   to be what I think of when I use the word,
 9   econometrics.
10              You know, linear regressions have a
11   wide range of different approaches within them.
12              But, I mean, I suppose it is
13   possible you can do nonlinear analyses.  I don't
14   think you would need to in a case like this, but
15   it is possible.
16              But, that is sort of what I had in
17   mind.
18        Q.    Okay.  When you say sort of what you
19   had in mind, was that actually what you had in
20   mind?
21        A.    Well, I mean, again, like I said,
22   there are things beyond linear regression.  You
23   could do nonlinear regressions, things like that.
24              So, I think sort of, what I had in
25   mind is as imprecise as it sounds.  That is the
```

Case 3:19-cv-03770-WHO   Document 239-11   Filed 09/02/20   Page 12 of 18
**David Blackburn, PH.D. - April 22, 2020**
**CONFIDENTIAL - ATTORNEYS' EYES ONLY**

76

1  precise answer.
2      Q.   And have you done nonlinear
3  regressions for price erosion?
4      A.   I don't know.
5      Q.   When you say you don't know, you
6  just don't remember one way or the other; is that
7  correct?
8      A.   That's correct.  I don't think so,
9  but I couldn't close off the possibility.
10     Q.   And would your linear regression
11 econometrics analysis be able to value the
12 non-price terms?
13     A.   Again, I think if you can identify
14 the non-price terms, then you can place a value
15 on them.
16          If you can place a value on them,
17 then you should be able to use, again whatever
18 the technique is, use those to differentiate what
19 is going on and why.
20     Q.   And, for example, cooperation on
21 additional, other research programs, how would
22 you place a value on that?
23     A.   I mean, as I sit here I couldn't
24 tell you.  I haven't seen the contract.  I don't
25 know what are in those terms.

Case 3:19-cv-03770-WHO   Document 239-11   Filed 09/02/20   Page 13 of 18
David Blackburn, PH.D. - April 22, 2020
CONFIDENTIAL - ATTORNEYS' EYES ONLY

77

1               But, people value terms and
2    contracts all of the time.  So, I don't see why
3    there is any reason to think why you wouldn't be
4    able to value those sorts of terms.
5          Q.    So, your general assumption is that
6    virtually all contract terms are going to have a
7    price that you quantify when you get excellent
8    people like NERA to do it, correct?
9          A.    I mean, I am not sure that I would
10   say it in that sarcastic way that you did, but --
11         Q.    No, let me stop you there.
12               Obviously, I didn't imply well,
13   obviously he works for NERA.  There is nothing
14   sarcastic.
15               You misunderstood me.  Let me re-ask
16   the question.
17               Your view is that with sophisticated
18   damages experts, that they can put a price value
19   on virtually any negotiated contract terms; is
20   that correct?
21         A.    So, I guess here is how I would say
22   it.  It might not be a damages expert.  It might
23   be an expert in some other field.
24               So, I think that it is always true
25   that there is some monetary value that you could

Case 3:19-cv-03770-WHO   Document 239-11   Filed 09/02/20   Page 14 of 18
David Blackburn, PH.D. - April 22, 2020
CONFIDENTIAL - ATTORNEYS' EYES ONLY

78

1  attach to a contractual term.
2           If you and I are having a
3  negotiation and I want to enter some term and you
4  don't want to enter that term, there is an amount
5  of additional money I could pay you to get you to
6  accept that term.
7           And there is some amount of
8  additional discount that you could give me to get
9  me to give up that term.
10          With a number of different
11 contracts, some of which have those terms, some
12 of which don't, you certainly could be able to
13 identify how the price changes, depending on
14 whether those terms are in there or not in there.
15          So, that is one way you could get
16 at it.
17          And, it is also something that could
18 be the -- potentially be the subject of expert
19 testimony from a non-damages expert.
20    Q.    And part of the basis for your
21 opinion that you believe damages are calculable
22 here is because whatever the terms are in the
23 supply agreements that Illumina negotiates, you
24 think that sophisticated experts of whatever
25 discipline would be able to put a price number on

79

1  it; is that correct?
2        A.   I mean, this comes back to the
3  question of whether or not these changes are
4  likely to exist in the first place.
5             I'm not sure that they are.  There
6  is certainly nothing in the PI motion or in
7  Mr. Van Oene's testimony or his declaration that
8  says this is a type of harm that is going to
9  happen.
10            So, it is not something that prior
11 to right now when you have been asking me, that I
12 spent any time thinking about it.
13       Q.   Okay.
14       A.   So, if that is likely to happen and
15 there is an argument and evidence before that it
16 is likely to happen, then I would think about it
17 more.
18            But, in general, the idea that we
19 can quantify contract terms, I think that is
20 generally true.
21       Q.   I believe you stated that the
22 expected sequencer placements for defendants for
23 ██████████████████████████████████  Is that
24 correct?
25       A.   That is what I said earlier.  I

Case 3:19-cv-03770-WHO   Document 239-11   Filed 09/02/20   Page 16 of 18
David Blackburn, PH.D. - April 22, 2020
CONFIDENTIAL - ATTORNEYS' EYES ONLY

98

1  help overcome some of those and lead to do some
2  research to potentially -- that could generate
3  sales in the future.
4           But, I think the general principle
5  is that it is essentially -- it is a marketing --
6  what you might classify as a marketing strategy.
7           That you give the product to people
8  who will use it.  And that will help you grow
9  sales in the future.  That is an investment.
10 BY MR. REINES:
11      Q.    And in terms of the -- is it your
12 belief that you could quantify the expansion of
13 sales that would result from a KOL site?
14      A.    I mean we will see the sales.  So, I
15 don't think it should be hard to quantify it.
16      Q.    And when you say we will see the
17 sales and it shouldn't be hard to quantify, can
18 you explain what that -- or whatever I guess you
19 would call it, the straightforward method would
20 be?
21      A.    Well, I mean I think you could
22 just -- I don't understand the question.
23          You just see them.  The sales are
24 made.  There will be records of it and you will
25 see that the records exist and see the sales.

99

```
 1                I'm not sure I understand the
 2      question.
 3           Q.   But, let's say there is 100 sales in
 4      the year.
 5                How would you be able to tie which
 6      of those sales contributed to by the presence of
 7      a KOL with the research and barriers that are
 8      appropriate?
 9           A.   I mean again, as I sit here, I can't
10      tell you exactly how you would distinguish it
11      from sales that would have been made otherwise.
12                You would do the same sorts of
13      things that we talked about before in terms of
14      case-by-case analyses or econometric analyses, in
15      order to identify the different factors that
16      happen at different times and how they flow into
17      customers' decisions.
18           Q.   Can you be any more specific than
19      that?
20           A.   Not until we see what happens, no.
21           Q.   Do you have any idea whether KOL
22      sites in the United States would contribute to
23      increased sales for defendants outside of the
24      United States?
25           A.   Sorry.  I got the end of the
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

157

```
 1            CERTIFICATE OF COURT REPORTER
 2   UNITED STATES OF AMERICA  )
 3   DISTRICT OF COLUMBIA      )
 4            I, LORI J. GOODIN, a Certified Shorthand
 5   Reporter do hereby certify:
 6            That prior to being examined, the witness
 7   in the foregoing proceedings was by me duly sworn
 8   to testify to the truth, the whole truth, and
 9   nothing but the truth.
10            That said proceedings were taken remotely
11   before me at the time and places therein set
12   forth and were taken down by me in shorthand and
13   thereafter transcribed into typewriting under my
14   direction and supervision;
15            I further certify that I am neither
16   counsel for, nor related to, any party to said
17   proceedings, not in any wise interested in the
18   outcome thereof.
19            In witness whereof, I have hereunto
20   subscribed my name.
21   Dated:   April 22
22
23            _____
24            Lori J. Goodin, RPR, CLR, CRR,
              RSA, California CSR #13959
25   My Commission expires May 14, 2021
```