UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ILLUMINA INC., et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>BGI GENOMICS CO., LTD., et al.,<br><br>　　　　Defendants. | **PUBLIC REDACTED VERSION OF APRIL 1, 2021 DISCOVERY ORDER (20-1465 ECF No. 315, 19-3770 ECF No. 313)**<br><br>Case No. 20-cv-01465-WHO (TSH)<br>Re: Dkt. Nos. 288, 306<br><br>Case No. 19-cv-03770-WHO (TSH)<br>Re: Dkt. No. 303 |

The Court held a hearing on March 30, 2021 concerning two joint discovery letter briefs. This order follows.

**A.    Illumina's Interrogatories 2 and 22 (20-1465 ECF No. 288)**

In 20-1465 (but not 19-3770), Illumina moves to compel further responses to its interrogatories ("rogs") 2 and 22. Rog 2 asks Defendants to "Identify all instances in which CoolMPS has been used, distributed, tested, offered for sale, or sold in the United States or abroad, and the circumstances relating to such events, including (without limitation) which Defendant or third party used or distributed CoolMPS, when and where such event occurred, whether such event occurred at the direction or control of another entity, and the intended purpose of such event." Defendants' response is as follows: "CoolMPS has not been sold, distributed, or offered for sale in the U.S. Development of CoolMPS began in 2016. Development experiments relating to CoolMPS also occurred in 2018 and 2019. CoolMPS commercial kit products imported from MGI were used in CGI's facility in San Jose on a number of occasions relating to development beginning on or about January 2020."

Rog 22 is the same as rog 2 but asks about StandardMPS. Defendants' response is:

"Defendants have not distributed, sold, or offered for sale StandardMPS in the U.S. Defendants have used StandardMPS internally for their own purposes, [redacted]."

Illumina moves to compel two types of information responsive to these rogs. First, Illumina seeks to learn the number of times that Defendants have used CoolMPS and StandardMPS in the United States. Contrary to Defendants' argument, this information is responsive to the rogs, which ask Defendants to "Identify all instances in which CoolMPS [or StandardMPS] has been used . . . in the United States . . ." Defendants' response to rog 2 states that CoolMPS has been used in the San Jose facility "on a number of occasions" since January 2020 but does not say or estimate what that number is. Their response to rog 22 says that they "have used" StandardMPS in connection with two other companies, but does not say how many times they have used it.

Because each use is an alleged infringement, discovery about the number of times Defendants have infringed in the United States is relevant to damages. *See TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1291 (Fed. Cir. 2020) (patent owner "presented no evidence of damages caused by Adobe's direct infringement" where it did not provide "the number of times that Adobe employees installed Acrobat"). Also, the number of times Defendants have infringed in the United States is relevant to *Georgia Pacific* factor 11: "The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use." *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

Defendants argue that coming up with an exact answer to this question is extremely burdensome and perhaps impossible. They say that [redacted]. They assert that it is not a simple question to determine how many times any given chemistry has been used. Defendants say that performing such an analysis would require combing through Defendants' millions of pages of produced documents, identifying the reagents that were actually used, and tallying such uses. They say this is too burdensome and not proportional to the needs of the case.

Defendants present argument as if a rog response must contain either (1) perfect information or (2) no information. The Court doesn't buy it. Defendants can use their best efforts to come up with a reasonable estimate. Rather than reviewing every single document that may

2

reflect an infringing use, Defendants can review samples, perhaps concerning certain periods of time or certain types of experiments, and extrapolate from those.  Defendants can also interview their employees to get their best estimates.  This will be hard work, and it will require more than just a back-of-the-envelope guess, but with appropriate effort Defendants can come up with an informed estimate of how often they have used CoolMPS or StandardMPS in the United States.

Let's turn to the next issue.  Illumina moves to compel worldwide sales information of the accused products.  This information is relevant for two reasons.  First, it is relevant to whether a permanent injunction should issue.  In granting a preliminary injunction, Judge Orrick found that foreign sales of Defendants' accused products are relevant to irreparable harm.  He explained that: "It is undisputed that Illumina is currently the primary actor in the market, and BGI's commercial expansion into the United States would create essentially a two-player market.  Sales made to BGI would almost certainly translate to lost revenue for Illumina."  19-3770 ECF No. 185 at 18.  "In addition, there is a high likelihood of price erosion.  BGI admits that it competes with Illumina on price and touts its products as having a lower price point."  *Id*.  "BGI also does not seriously dispute that in China, where it has already competed with Illumina, Illumina has had to lower its prices.  Although BGI suggests that sales in China are irrelevant to the U.S. market, it does not provide any substantive argument to distinguish the two markets.  I am persuaded by Illumina's position that evidence from another market in which Illumina and BGI have competed is probative of the potential impact of competition in the United States."  *Id*. (citations omitted).  Indeed, given Defendants' representation that they have not made any sales in the United States, it would seem that foreign sales in markets where Illumina also competes might be the best way to show the price erosion and loss of market share that could happen if a permanent injunction were not issued.

Second, foreign sales are relevant to the availability and acceptability of CoolMPS in the market, in light of Defendants' assertion in their response to Illumina's rog 12 that CoolMPS does not infringe.  This means that if Illumina proves at trial that StandardMPS infringes, Defendants can say that CoolMPS is a non-infringing alternative.  Information about the relative sales of StandardMPS and CoolMPS worldwide is relevant to show whether CoolMPS is an available and viable commercially acceptable alternative.

3

Defendants do not have much of a response.  They say this discovery is not proportional to the needs of the case, but they fail to identify any burden associated with producing their consolidated audited financial information, or doing a database pull of worldwide sales information for the accused products.

Accordingly, the Court grants Illumina's motion to compel for the reasons explained above.

**B.     Illumina's Subpoenas to MyChem LLC and Chanfeng Zhao (20-1465 ECF No. 306; 19-3770 ECF No. 303)**

Illumina served document and deposition subpoenas on non-parties MyChem and its general manager, Ms. Chanfeng Zhao.  The document subpoena seeks (1) "Documents sufficient to show the Chemicals that You supplied to Defendants, including the names, molecular structures, and chemical, physical, and spectral properties of the Chemicals"; (2) "Documents sufficient to show Your development work related to any Chemicals that You supplied to Defendants that include azidomethyl"; and (3) "Communications with Defendants related to the development of any Chemicals that You supplied to Defendants that include azidomethyl."  The deposition subpoena seeks Zhao's testimony.  MyChem and Zhao, represented by the same counsel as Defendants, have objected to the subpoenas across the board.

Illumina says that MyChem supplies accused azidomethyl nucleotides to Defendants in the United States.  Therefore, Illumina reasons, MyChem's documents are relevant to show MyChem's direct infringement, for which Defendants are liable for inducing infringement.  Illumina also says that MyChem's internal documents may be relevant to willfulness if they evidence oral communications with Defendants or other circumstantial evidence showing that Defendants were aware of and copying Illumina's patents.

Let's break down the requests.  Documents responsive to request 1 (documents sufficient to show the chemicals that MyChem supplied to Defendants) and request 3 (communications with Defendants related to the development of the azidomethyl chemicals MyChem supplied to them) should also be in the possession of Defendants.  Rule 26 states that "the court must limit the . . . extent of discovery otherwise allowed by these rules . . . if it determines that . . . the discovery . . .

4

1  can be obtained from some other source that is more convenient, less burdensome, or less
2  expensive . . ." Fed. R. Civ. Proc. 26(b)(2)(C)(i).  "[T]he Ninth Circuit has long held that
3  nonparties subject to discovery requests deserve extra protection from the courts." *High Tech*
4  *Medical Instrumentation, Inc. v. New Image Indus., Inc.*, 161 F.R.D. 86, 88 (N.D. Cal. 1995)
5  (citing *United States v. C.B.S.*, 666 F.2d 364, 371-72 (9th Cir. 1982)).

6  Here, documents responsive to requests 1 and 3 can more conveniently be obtained from
7  Defendants.  Defendants state that they produced custodial documents including emails in
8  response to Illumina's ESI search requests, which included the term "*azid*" among others, and
9  they say this captured relevant communications between MyChem and Defendants responsive to
10 the subpoena.  During meet and confer, Defendants offered to produce all non-privileged custodial
11 emails hitting on the term "MyChem" if Illumina would withdraw the subpoenas, an offer
12 Illumina declined.  However, the Court will hold Defendants to that offer.  The Court therefore
13 orders Defendants to produce all non-privileged custodial emails hitting on the term "MyChem."
14 Between this order and Defendants' prior production of custodial documents, there is no
15 justification for seeking documents responsive to requests 1 and 3 from MyChem.

16 Now let's talk about request 2.  MyChem's internal documents concerning its development
17 work are undoubtedly confidential research, development, or commercial information within the
18 meaning of Federal Rule of Civil Procedure 45(d)(3)(B)(i).  That means Illumina must show "a
19 substantial need" for this material.  Fed. R. Civ. Proc. 45(d)(3)(C)(i).  The Court is unpersuaded
20 that Illumina has shown this.  Illumina's infringement contentions do not disclose any contention
21 that Defendants have induced their suppliers such as MyChem to infringe, which means that
22 MyChem's development work may not even be relevant.  Illumina argues otherwise and cites its
23 infringement contentions (20-1465 ECF No. 211-6 at 3, 5) to assert that "Defendants have induced
24 infringement by (among other things) 'controlling the design, manufacture, and supply' of the
25 'Associated BGI Sequencing Products,' which includes any reagents 'that contain nucleotides
26 with a 3'-Oazidomethyl blocking group.'"  However, the citation to page 3 of the infringement
27 contentions refers to BGI sequencer instruments "that contain nucleotides with a 3'-Oazidomethyl
28 blocking group (collectively, 'Associated BGI Sequencing Products') *that are used* in conjunction

5

with the BGI Sequencers *for their intended purpose of DNA sequencing*." (emphasis added) That's what purchasers do with Defendants' products, not what suppliers do.

The citation to page 5 of the infringement contentions refers to the following paragraph, in which the Court has numbered the sentences:

> [1] BGI has also induced and contributed to and/or threatens to induce and contribute to infringement *by customers or other third parties by selling, offering to sell, and/or importing* BGI Sequencers and Associated BGI Sequencing Products in the United States. [2] Each of the BGI defendants has induced infringement and/or threatens to induce infringement by direct infringement by each of the other BGI defendants of the '973, '444, and '025 Patents. [3] BGI has induced infringement and/or threatens to induce infringement by controlling the design, manufacture, and supply of the BGI Sequencers and Associated BGI Sequencing Products with the knowledge and specific intent that *users will use the BGI Sequencers and Associated BGI Sequencing Products to infringe* the '973, '444, and '025 Patents. [4] BGI has induced infringement and/or threaten to induce infringement by controlling the design, manufacture, and supply of the BGI Sequencers and Associated BGI Sequencing Products to infringe the Patents-in-Suit. [5] BGI has induced infringement and/or threaten to induce infringement by controlling the design, manufacture, and supply of materials or apparatuses *to be used with the BGI Sequencers or Associated BGI Sequencing Products to infringe* the Patents-in-Suit. [6] BGI has induced infringement and/or threatens to induce infringement *by disseminating promotional and marketing materials* relating to the BGI Sequencers and Accused BGI Sequencing Products to infringe the '973, '444, and '025 Patents. [7] BGI has induced infringement and/or threatens to induce infringement *by creating distribution channels* for the BGI Sequencers and Associated BGI Sequencing Products to infringe '973, '444, and '025 Patents. [8] BGI has induced infringement and/or threatens to induce infringement *by distributing other instructional materials, product manuals, technical materials, and bioinformatics software platforms* for the BGI Sequencers and Associated BGI Sequencing Products to facilitate infringement of '973, '444, and '025 Patents. [9] BGI has induced infringement and/or threatens to induce infringement by participating in, supporting, and encouraging *others' use* of the BGI Sequencers and Associated BGI Sequencing Products to infringe '973, '444, and '025 Patents. [10] BGI has contributed to infringement of the '973, '444, and '025 Patents because it knows the BGI Sequencers and Associated BGI Sequencing Products constitute material parts of the '973, '444, and '025 Patents and that they are not a staple article or commodity of commerce suitable for substantial noninfringing *use* and that their *use* infringes the '025 Patent. (emphasis added)

A fair reading of these infringement contentions is that they are all directed toward inducing purchasers of Defendants' products to infringe when they use the products, or that the BGI entities

induce each other to infringe. Sentence one says that BGI induces customers and other third parties to infringe by providing or offering to provide (selling, offering to sell or importing) the products to them. Sentence two says that the BGI entities induce each other to infringe. Sentence three says the direct infringement occurs when users use the products, again a reference to purchasers. The fourth sentence does not identify any direct infringement. The fifth sentence is again a reference to the products being used. Sentence six says BGI induces infringement by disseminating marketing materials, which is again a focus on sales. Sentence seven refers to BGI creating distribution channels, which refers to BGI distributing the products; acquiring a product from a supplier is not a *distribution* channel. The eighth sentence refers to BGI distributing related materials that would help users use the products. Sentence nine refers to BGI encouraging others to use the products, which is what end users do. And sentence ten again refers to users using the products. Patent Local Rule 3-1(d) states that infringement contentions must state "[f]or each claim which is alleged to have been indirectly infringed, *an identification of any direct infringement . . .*" (emphasis added) The only direct infringement specifically identified in the cited portions of Illumina's infringement contentions is direct infringement by purchasers who use the products or by other Defendants. Nothing in Illumina's infringement contentions suggests that it is pursuing a theory that Defendants induce their *suppliers* to infringe.

      In so reasoning, the Court is not adopting a rule that relevance in a patent case is limited to what is disclosed in the infringement contentions. After all, Patent Local Rule 3-6(c) states that the recent discovery of nonpublic information can itself be a basis for seeking leave to amend infringement contentions. Rather, the Court is applying the "substantial need" test in Rule 45(d)(3)(C)(i). The close of fact discovery in these civil actions was March 26, 2021. Illumina's existing infringement contentions do not contend that Defendants induced their suppliers to infringe, and Illumina has not moved to amend to add such a contention. At this late stage in these cases, with fact discovery over (except for what the Court orders in this order and in motions to compel that may be filed until April 2, 2021), the Court has a serious concern that Illumina's inducement theory concerning MyChem isn't part of Illumina's case and likely never will be. Accordingly, Illumina has not shown a substantial need for MyChem's internal documents about

its development.

Illumina's citation to *Dr. Systems, Inc. v. Fujifilm Medical Systems USA, Inc.*, 2008 WL 1734241, *3 (S.D. Cal. April 10, 2008), for the broad proposition that infringement contentions cannot support a relevance objection is not persuasive. In *Dr. Systems*, the court held that the plaintiff could take discovery into not only the products that were expressly accused in the infringement contentions but also of products that were related to those that were expressly accused. More to the point, discovery in that case was still ongoing, so there was additional time to gather evidence and work up further theories of liability, and the court was not applying Rule 45's "substantial need" test. Here, by contrast, fact discovery is over, and Illumina has done nothing to make this new inducement theory part of its case. *See Finjan, Inc. v. Qualys, Inc.*, 2020 WL 5569704, *2 (N.D. Cal. Sept. 17, 2020) ("[A]s matters stand now, Finjan is trying to obtain discovery based on infringement theories that are way outside its infringement contentions, fact discovery is about to close, and Finjan has not even asked Judge Gonzalez Rogers for permission to amend. The undersigned is quite skeptical that Finjan's new infringement theories will ever be in this case."). In this situation, there is no substantial need for MyChem's internal documents.

As a back up argument, Illumina argues that MyChem's internal documents may evidence oral communications with Defendants (e.g., instructions or specifications related to infringement) or other circumstantial evidence showing that Defendants were aware of and copying Illumina's asserted patents, which could be relevant to willfulness. However, that feels like baseless speculation. It is also a strange, roundabout way of taking discovery. Defendants' own documents are much more likely to show what they were aware of. Accordingly, this theory of relevance also does not amount to a substantial need.

Turning to the deposition subpoena for Zhao, Illumina repeats its arguments that Zhao may have information about MyChem's direct infringement, Defendants' inducements of MyChem, and Defendants' willfulness in carrying out their own infringement. But again, Illumina must show that it has a substantial need to depose Zhao concerning MyChem's confidential research, development and commercial information. As discussed above, Illumina's argument in the letter brief that Defendants induced MyChem to infringe asserts a liability theory that does not seem to

be in the case, and the suggestion that a witness who used to work for Illumina – not Defendants – would somehow have "testimony . . . that cannot be otherwise" obtained, Fed. R. Civ. Proc. 45(d)(3)(C)(i), concerning the willfulness of Defendants' conduct is not at all persuasive.

Illumina's subpoenas to MyChem and Zhao are quashed.

**IT IS SO ORDERED.**

Dated: April 1, 2021

THOMAS S. HIXSON
United States Magistrate Judge