UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ILLUMINA, INC., et al.,

        Plaintiffs,

     v.

BGI GENOMICS CO., LTD, et al.,

        Defendants.

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART MOTION TO STRIKE OPINIONS OF DR. JOSEPH PUGLISI**

Case No.  19-cv-03770-WHO
Re: Dkt. Nos. 376, 377, 378, 379, 386, 387, 399, 412

Case No.  20-cv-01465-WHO
Re: Dkt. Nos. 406, 407, 421, 433, 448

Plaintiffs Illumina Inc. and Illumina Cambridge Ltd. (collectively, "Illumina") move for summary judgment on defendants BGI Genomics Co., Ltd., BGI Americas Corp., MGI Tech Co., Ltd., MGI Americas, Inc., and Complete Genomics, Inc.'s (collectively, "BGI") counterclaims for infringement under its U.S. Patent No. 9,944,984 ("'984 Patent").  Illumina also moves to strike portions of BGI's infringement expert, Dr. Puglisi's report.  For the reasons explained below, Illumina's motion to strike portions of the Puglisi Report is GRANTED in part and DENIED in part.  Illumina's motion for summary judgment related to (1) the noninfringement of the '984 Patent; (2) BGI's doctrine of equivalents theory under the '984 Patent; (3) BGI's "inequitable conduct" defense; and (4) BGI's other uncontested defenses is GRANTED.

## BACKGROUND

### I.    PROCEDURAL BACKGROUND

Illumina filed the complaint in this matter on June 27, 2019.[1]  Dkt. No. 1.  It alleges that BGI

---

[1] This matter ("*Illumina I*") is related to *Illumina Inc., et al., v. BGI Genomics Co., Ltd.*, et al., Case No. 20-cv-1465 (N.D. Cal.) ("*Illumina II*"), in which Illumina alleges that BGI infringes different

infringes U.S. Patent No. 9,410,200 (the "'200 Patent") and 7,566,537 (the "'537 Patent") ("Asserted Patents") by selling its sequencers and related reagents. *Id.* ¶¶ 2, 33–44. Illumina asserts that BGI's sequencers infringe claim 1 of the '537 Patent and claim 1 of the '200 Patent. *Id.* ¶¶ 35, 37, 41. BGI filed counterclaims, alleging that Illumina's DNA sequencing systems ("Accused Products") infringe claims 1–3 and 5 of its '984 Patent. Dkt. No. 94 ("First Amended Answer" or "FAA") ¶ 10. On June 26, 2020, I entered a claim construction order ("Claim Construction Order") on terms in Illumina's '537 and '200 Patents as well as BGI's '984 Patent. Dkt. No. 190 ("Order").

Illumina emailed BGI on June 30, 2020, and asked it to drop its infringement contentions in light of the Claim Construction Order. Dkt. No. 379-6 at 7. On July 16, 2020, BGI responded that its infringement contentions under the '984 Patent were sufficient. *Id.* After the email exchange, Illumina did not respond and BGI did not amend its infringement contentions. Dkt. No. 379 ("MTS Mot.") at 15. Illumina also informed BGI that its infringement contentions were deficient in its October 13, 2020, and December 7, 2020, interrogatory responses but responded to them. *See* Dkt. No. 387-6 at 8; Dkt. No. 387-8 at 6.

Fact discovery closed on March 26, 2021 and expert discovery closed on May 28, 2021. *Illumina II*, Dkt. No. 249 at 2. On June 16, 2021, Illumina filed a motion for summary judgment on BGI's counterclaims. Dkt. No. 377 ("Mot."); *see also Illumina II*, Dkt. No. 407. On the same day, Illumina also filed a motion to strike the expert opinions of BGI's technical expert, Dr. Joseph Puglisi. Dkt. No. 379.

## II.  PATENTS

Further background of the '984 Patent is discussed in the Claim Construction Order. Order at 15–16. The '984 Patent involves an "array," or mechanism for analyzing multiple DNA fragments, that aims to increase the accuracy and efficiency of sequencing and thereby lower the cost. '984 Patent at 3:44-53; 8:4-40. Target DNA is copied and modified prior to introduction to the array so that it will bind with the capture oligonucleotides on the array. *See*, *e.g.*, *id.* at

---

patents by making, selling, and using a different set of products. Further background in this matter is discussed in *Illumina Inc., et al., v. BGI Genomics Co., Ltd.*, et al., Case No. 19-cv-3770, Dkt. No. 185. (N.D. Cal.).

United States District Court
Northern District of California

6:17-30. It is then introduced to the array and binds to the capture oligonucleotides, and the target DNA can be sequenced by measuring signals or labels on the array. *Id.* at 3:44–4:23, 17:30-18:33. The target DNA fragments are first amplified so that multiple copies of the same fragment are present in one large macromolecule (as opposed to one single DNA fragment). *Id.* at 11:7-11. Amplification is generally understood to allow for stronger signal detection. *Id.* at 2:36-40. After the DNA fragment circles are formed, they are bound together into larger molecules, called "concatemers," containing multiple copies of the same circular DNA fragments, usually in a process called rolling circle replication ("RCR"). *Id.* 11:45-58. Because there will be multiple copies of the same DNA fragment present at a particular binding site, the detection and sequencing of that fragment will be improved.

## LEGAL STANDARD

### I.   SUMMARY JUDGMENT

A party is entitled to summary judgment where it "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine if it could reasonably be resolved in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material where it could affect the outcome of the case. *Id.*

The moving party has the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Once the movant has made this showing, the burden shifts to the nonmoving party to identify specific evidence showing that a material factual issue remains for trial. *Id.* The nonmoving party may not rest on mere allegations or denials from its pleadings but must "cit[e] to particular parts of materials in the record" demonstrating the presence of a material factual dispute. FED. R. CIV. P. 56(c)(1)(A); *see also Liberty Lobby*, 477 U.S. at 248. The nonmoving party need not show that the issue will be conclusively resolved in its favor. *Id.* at 248–49. All that is required is the identification of sufficient evidence to create a genuine dispute of material fact, thereby "requir[ing] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* (internal quotation marks

1   omitted).  If the nonmoving party cannot produce such evidence, the movant "is entitled

2   to . . . judgment as a matter of law because the nonmoving party has failed to make a sufficient

3   showing on an essential element of her case."  *Celotex*, 477 U.S. at 323.

4       On summary judgment, the court draws all reasonable factual inferences in favor of the

5   nonmoving party.  *Liberty Lobby*, 477 U.S. at 255.  "Credibility determinations, the weighing of

6   the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those

7   of a judge."  *Id.*  However, conclusory and speculative testimony does not raise a genuine factual

8   dispute and is insufficient to defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE*

9   *Corp.*, 594 F.2d 730, 738–39 (9th Cir. 1979).

10  ## II.    MOTION TO STRIKE

11      Patent Local Rule 3 "requires patent disclosures early in a case and streamlines discovery

12  by replacing the series of interrogatories that parties would likely have propounded without it."

13  *ASUS Computer Int'l v. Round Rock Research, LLC*, No. 12-CV-02099-JST, 2014 WL 1463609,

14  at *1 (N.D. Cal. Apr. 11, 2014) (internal quotation marks and modifications omitted).  Patent

15  Local Rule ("Patent L.R.") 3-1 requires that a party claiming patent infringement serve a

16  "Disclosure of Asserted Claims and Infringement Contentions" that includes "[e]ach claim of each

17  patent in suit that is allegedly infringed by each opposing party, including for each claim the

18  applicable statutory subsections of 35 U.S.C. § 271 asserted."  Patent L.R. 3-1(a).  This requires "a

19  limitation-by-limitation analysis, not a boilerplate reservation."  *Rambus Inc. v. Hynix*

20  *Semiconductor Inc.*, No. 05-CV-00334-RMW, 2008 WL 5411564, at *3 (N.D. Cal. Dec. 29,

21  2008).

22      Given the purpose of the Patent Local Rules, "a party may not use an expert report to

23  introduce new infringement theories, new infringing instrumentalities, new invalidity theories, or

24  new prior art references not disclosed in the parties' infringement contentions or invalidity

25  contentions."  *Verinata Health, Inc. v. Sequenom, Inc.*, No. 12-CV-00865-SI, 2014 WL 4100638,

26  at *3 (N.D. Cal. Aug. 20, 2014) (internal quotation marks omitted).  In determining whether to

27  strike some or all of an expert report for failure to comply with the patent local rules, courts in this

28  district have asked, "[W]ill striking the report result in not just a trial, but an overall litigation, that

United States District Court
Northern District of California

1   is more fair, or less?" *Apple Inc. v. Samsung Electronics Co.*, No. 11-CV-01846-PSG, 2012 WL

2   2499929, at *1 (N.D. Cal. June 27, 2012).

3                                    **DISCUSSION**

4   **I.       MOTION TO STRIKE OPINIONS OF DR. JOSEPH PUGLISI**

5           Illumina moves to strike portions of the opening infringement report of BGI's technical

6   expert, Dr. Joseph Puglisi ("Puglisi Report") because BGI allegedly proffered new theories, which

7   it had not disclosed before.  MTS Mot. at 1, 18 (moving to strike section VII.A.6 and ¶¶ 165–68,

8   170–71, 176, and 178–79).  The claim limitation at issue is the requirement that "more than 50%

9   of the DNA binding regions in the array have multiple copies of one single DNA of said more

10  than $10^5$ different DNAs."  '984 Patent 75:26-28.

11          Some background is necessary to understand this dispute.  According to Illumina, BGI's

12  infringement theory "was based on the erroneous belief that all that is required by this limitation is

13  that 50% of the binding regions comprise multiple copies of a DNA molecule, regardless of

14  whether there are other molecules or other sequences in the same binding region."  MTS Mot. at 7.

15  Illumina asserts that BGI's sole infringement theory was that Illumina's "finished clusters, which

16  are generated by clonally amplifying template DNA until the cluster has ~1000 copies, satisfy the

17  limitation because they include multiple copies of a DNA sequence."  *Id.* at 10.  In my Claim

18  Construction Order, however, I construed the claim limitation to require that "more than 50% of

19  the DNA binding regions in the array are occupied by a single DNA molecule comprising multiple

20  copies of only one" DNA sequence.  Claim Construction Order at 17.

21          In light of the Order, Illumina emailed BGI on June 30, 2020, and asked it to drop its

22  infringement contentions because BGI "has no basis . . . to contend that more than 50% of the

23  nanowells in Illumina's accused products are either (a) 'occupied by a single DNA molecule' or

24  (b) comprise 'multiple copies of only one of the more than 100,000 genomic DNA sequences' as

25  required by the Court's Order."  Dkt. No. 379-6 at 7.  On July 16, 2020, BGI responded that its

26  infringement claims under the '984 Patent "continue to be well founded even after the Court's

27  claim construction" in part because as BGI "pointed out in its complaint and its infringement

28  contentions, the cluster generation process . . . begins with a single target template."  *Id.* at 2.  BGI

United States District Court
Northern District of California

further explained,

> "(A) This single template is formed by a single fragment of DNA that is bound in the nanowell.  Polymerase then converts the single stranded portion of that fragment into double stranded DNA.  That double stranded molecule contains two copies for the same DNA sequence.  This molecule satisfies the elements [Illumina contends] are absent.  (B) Additionally, after the first double stranded molecule containing multiple copies of the same DNA is denatured, and the remaining strand goes through bridge amplification, the resulting double stranded molecule also satisfies the claim elements [Illumina contends] are missing."

*Id.*  After the email exchange, Illumina did not respond and BGI did not amend its infringement contentions.  MTS Mot. at 15.  Illumina also informed BGI that its infringement contentions were deficient but responded to them in its October 13, 2020, and December 7, 2020, interrogatory responses.  Dkt. No. 401 ("MTS Reply") at 2; Dkt. No. 387-6 at 8 (referring to the July 16, 2020, email and asserting that "CGI argued a new infringement theory that is both wrong in substance and unsupported by CGI's infringement contentions"); Dkt. No. 387-8 at 6 (same).

In considering Illumina's motion to strike, I look at two issues: disclosure and fairness.  I conclude that BGI failed to properly disclose the three allegedly "new" theories found in the Puglisi Report:  (1) that the intermediate structures, as opposed to the final clusters, such as "a double-stranded DNA fragment is a 'single DNA molecule comprising multiple copies of only one' genomic DNA sequence that occupies a binding region as required by claim limitation 1(g)" ("Double-Stranded DNA theory"); (2) "that the number of nanowells that pass filter shows that greater than 50% of the nanowells meet the requirements of [the] claim limitation" ("Pass Filter theory"); and (3) that claim 1 is infringed under DOE.  *Id.* at 12.  However, because Illumina waited more than a year until after fact discovery closed to challenge the first two, I will not strike them.  The DOE theory is different—it was first disclosed in the Puglisi Report, and it will be struck.

### A.     Disclosure

BGI argues that its infringement contentions fully comply with the disclosure requirements under Patent L.R. 3-1 and that Illumina was put on notice about what was accused.  Dkt. No. 389 ("MTS Opp.") at 4, 11.   I disagree.

### 1.      Double-Stranded DNA Theory

First, BGI argues that it did not solely disclose that Illumina's "finished clusters" infringed, but that it also asserted the Double-Stranded DNA theory accusing Illumina's cluster generation process "based on the formation of infringing DNA molecules during the process of exclusion amplification."  MTS Opp. at 13.  It points to its Patent L.R. 3-1 Disclosures, where it stated that the "'DNA array' claimed by the '984 Patent is generated *during the use of, and/or present in*, each of the Accused Illumina Systems."  Dkt. No. 389-2 ("BGI's Patent L.R. 3-1 Disclosures") at 2 (emphasis added); *see also* Dkt. No. 54 ("Counterclaims") ¶¶ 50–52.

BGI also asserts that if it had not been accusing the intermediate structures, and only the final clusters, then it would not have included contentions regarding the process for cluster formation in its Patent L.R. 3-1 Disclosures.  MTS Opp. at 13–14.  For example, BGI's infringement analysis described the steps of Illumina's ExAmp process for cluster generation in detail, including the formation of the exact double-stranded DNA molecules accused of infringement.  *See, e.g.*, BGI's Patent L.R. 3-1 Disclosures, Ex. A ("'984 Claim Chart") at 4, 45 ("By enabling simultaneous seeding (landing of the DNA strand in the nanowell) and amplification, exclusion amplification promotes monoclonal cluster generation within the nanowells."); *id.* at 69 ("After strand capture, the complementary strand is generated using polymerase, thereby resulting in an immobilized template strand."); *id.* at 70 ("Following bridge formation, the complementary strand is generated by a polymerase, resulting in a second nucleotide template strand.").  As a result, it argues that the "theories" in the Puglisi Report, which Illumina asserts should have been cited in BGI's contentions, are merely additional details and are proper because they do not constitute a new theory of infringement but rather elaborate on the previously disclosed theory.  *See Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-CV-03999-BLF, 2015 WL 3640694, at *2 (N.D. Cal. June 11, 2015) ("[T]he Patent Local Rules do not require perfect clarity, only reasonable notice that is 'as specific as possible' given the information of which a plaintiff is aware.").

Illumina contends, correctly, that none of BGI's statements provide notice that BGI "was accusing a particular 'intermediate structure' (i.e., the double-stranded DNA)" of infringing the

United States District Court
Northern District of California

1    claim limitation.  MTS Reply at 5.  While BGI claims that it discusses the cluster generation

2    process in its contentions only because it was accusing the double-stranded DNA of infringement,

3    Illumina points out that BGI could also discuss the process to support its original theory, that each

4    of the "~1000 copies" has the same sequence—a theory which fails in light of the Claim

5    Construction Order.  *Id.* at 4.  Similarly, Illumina asserts that BGI contended that "the 'DNA

6    array' claimed by the '984 Patent is generated during the use of, and/or present, in each of the

7    Accused Illumina Systems" to show that infringement occurs by "making" the claimed DNA

8    arrays and not to accuse transient, intermediate structures "that exist only momentarily and are not

9    even found in the finished array."  *Id.*

10         BGI's Double-Stranded DNA theory was not explicitly disclosed under the Patent Local

11    Rules and cannot be implicitly disclosed.  *See Thought, Inc. v. Oracle Corp.*, No.

12    12-CV-05601-WHO, 2016 WL 3230696, at *6 (N.D. Cal. June 13, 2016), *aff'd*, 698 Fed. Appx.

13    1028 (Fed. Cir. 2017) (unpublished) (rejecting an argument that an infringement theory was

14    "implicitly" disclosed because the "purpose of requiring parties to disclose the basis for their

15    contentions is to make them explicit and streamline patent litigation."); *see also DCG Sys. v.*

16    *Checkpoint Techs., LLC*, No. C 11-03792 PSG, 2012 WL 1309161, at *2 (N.D. Cal. Apr. 16,

17    2012) (a patentee must "disclose what in each accused instrumentality it contends practices each

18    and every limitation of each asserted claim to the extent appropriate information is reasonably

19    available to it."); *Finjan, Inc. v. Proofpoint, Inc.*, No. 13-CV-05808-HSG, 2015 WL 1517920, at

20    *7 (N.D. Cal. Apr. 2, 2015) ("if [plaintiff] believes that the first and second functions are

21    contained within the obfuscated scripts, it was obligated to say so explicitly in its infringement

22    contentions.  Neither the Court nor the Defendants should be required to guess which aspects of

23    the accused products allegedly infringe each claim element.").

24            **2.**      **Pass Filter Theory**

25         Second, BGI asserts that the "pass filter" data from Illumina's sequencing is evidence in

26    support of infringement under the Double-Stranded DNA theory and not a new theory.  MTS Opp.

27    at 16; *see Blue Coat*, 2015 WL 3640694, at *2 ("[t]he dispositive inquiry in a motion to strike is []

28    whether the allegedly undisclosed 'theory' is in fact a new theory . . . or whether the 'theory' is

instead the identification of additional evidentiary proof showing that the accused element did in fact practice the limitation.").  Though it does not dispute that it does not discuss the Pass Filter theory in its infringement contentions, it argues that the "passing filter statistics from Illumina's sequencing runs is evidence to show that 50% threshold of the disputed element in the asserted claims is met."  MTS Opp. at 17; *see also* Dkt. No. 387-12 ("Puglisi Rep.") ¶¶ 129–34.  For example, Puglisi explains that "the intermediate DNA molecules that infringe the 'more than 50%' element are necessarily formed in the nanowells on Illumina's accused flow cells that 'pass filter.'"  MTS Opp. at 16; Puglisi Rep. ¶ 134.

Illumina responds that the Pass Filter theory is a new theory because prior to the Claim Construction Order, "whether nanowells 'pass filter' was irrelevant to BGI's original infringement theory," which was based on the belief that the claim limitation could be satisfied "regardless of whether there were multiple sequences or multiple molecules in the same nanowell."  Mot. at 16. Furthermore, because the "only theory of infringement to which BGI links the 'pass filter' data" is the Double-Stranded DNA theory, the Pass Filter theory is also unsupported in BGI's infringement contentions.  MTS Reply at 9.  For those reasons, I agree with Illumina that BGI's Pass Filter theory was not properly disclosed in its infringement contentions.

### 3.    Doctrine of Equivalents

Finally, BGI argues that contrary to Illumina's assertion, it preserved its arguments under DOE.  MTS Opp. at 17–19.  Illumina points out that the only reference to DOE in BGI's infringement contentions is a general boilerplate statement that "[t]o the extent that any limitation of any asserted claim is not literally present in the Accused Illumina Systems, any such limitations are present under the DOE."  Claim Chart at 1; MTS Mot. at 17.  Courts in this district have rejected such boilerplate language.  *See, e.g.*, *ASUS*, 2014 WL 1463609, at *3 (granting motion to strike portions of expert reports opining on DOE where the DOE theory was placeholder language: "to the extent that any claim element is found not to be literally embodied in the Accused Instrumentalities, Round Rock contends that the Accused Instrumentalities embody such claim elements under the doctrine of equivalents.") (collecting cases); *OptimumPath, LLC v. Belkin Int'l, Inc.*, No. 09-CV-01398 CW, 2011 WL 1399257, at *8 (N.D. Cal. Apr. 12, 2011), *aff'd*, 466 F.

1   App'x 904 (Fed. Cir. 2012) (noting that "judges of this court have rejected plaintiffs' attempts to

2   assert claims under the doctrine of equivalents with blanket statements.").

3       BGI contends that Puglisi's opinions on the DOE are in response to Illumina's arguments

4   on noninfringement in Illumina's interrogatory response.  MTS Opp. at 18.  Specifically, Illumina

5   identified another mechanism for the ExAmp process, where "the result of cluster generation is

6   multiple different single-stranded DNA molecules that each have at most one copy of a particular

7   sequence."  MTS Mot. at 7.  In these "polyclonal nanowells," "a single sequence can be detected

8   by filtering out the sequencing data from non-dominant clusters and using only the sequencing

9   data from the dominant cluster."  *Id.*  This is contrary to Illumina's other explanation of its flow

10  wells—that the cluster generation results in "monoclonal" clusters.  MTS Opp. at 18.

11  Consequently, BGI asserts that Puglisi should be permitted to testify regarding infringement under

12  the DOE in response to Illumina's competing explanations.

13      The two cases on which BGI relies are distinguishable.  The courts in *Finjan, Inc. v.*

14  *Symantec Corp.*, No. 14-CV-02998-HSG (JSC), 2017 WL 4025219, at *4 (N.D. Cal. Sept. 13, 2017)

15  and *Accord Facebook, Inc. v. BlackBerry Ltd.*, No. 18-CV-05434-JSW (JSC), 2019 WL 8013872, at

16  *9 (N.D. Cal. Sept. 17, 2019) found good cause for the patentee to amend its DOE theories where

17  the defendant had provided new information regarding its noninfringement arguments.  Here, the

18  question is not whether BGI has "good cause" to amend its DOE theories but whether it

19  adequately disclosed its DOE theories in the first place.  Because BGI's DOE theory is merely

20  boilerplate language, it should be rejected.  *See Blue Coat*, 2015 WL 3640694, at *5 (finding that

21  the plaintiff's "boilerplate and generic" DOE disclosures did not satisfy plaintiff's "obligation to

22  provide a limitation-by-limitation analysis of its theory of infringement" and "[h]ad Defendant

23  earlier moved to strike those embryonic disclosures, they would likely have been stricken as

24  violative of the Patent Local Rules.").

25      Furthermore, Illumina points out that it served the interrogatory response—that BGI refers

26  to as the "previously undisclosed mechanism for exclusion amplification"—on October 13, 2020,

27  five months before fact discovery closed.  Dkt. No. 387-6 at 7–8.  BGI had ample time to respond

28  during fact discovery and to seek leave to amend its DOE contentions.  It cannot justify adding

United States District Court
Northern District of California

10

new theories to its boilerplate DOE arguments in the Puglisi Report as a response to Illumina's allegedly new noninfringement arguments that were served seven months earlier. *See Dynetix Design Sols., Inc. v. Synopsys, Inc.*, No. 11-CV5973-PSG, 2013 WL 4537838, at *1 (N.D. Cal. Aug. 22, 2013) ("By failing to give Synopsys adequate notice of these theories during fact discovery, Dynetix severely prejudiced Synopsys' ability to refute any DOE theories."). "In sum, while equivalents theories can serve as 'Plan B' to literal infringement theories, if our local rules are to have any teeth, they must be adequately disclosed and supplemented along the way, should new evidence arise in discovery." *Id.*

### B. Fairness

Although I have determined that all three theories should have been disclosed, that does not establish that I should strike them from the Puglisi Report. In deciding whether to strike some or all of an expert report for failure to comply with the Patent Local Rules, I have to consider whether striking the expert report will result in a fairer litigation. *Apple*, 2012 WL 2499929, at *1. Illumina argues that it suffered prejudice from the lack of disclosure because it "never had the opportunity to review and evaluate BGI's actual infringement theories during fact discovery; instead, it had to guess about what infringement theory BGI might pursue until BGI served expert reports." MTS Reply at 14. BGI contends that Illumina's motion to strike Puglisi's report a year after fact discovery closed and a few weeks after expert discovery closed is untimely, although Illumina says that BGI was aware that Illumina believed its infringement contentions to be new theories and that BGI was obliged to seek amendment for its infringement contentions. In short, the parties dispute whether Illumina should have compelled BGI to amend its infringement contentions or whether BGI should have amended its infringement contentions after receiving notice from Illumina about the alleged deficiencies.

Two cases from this District are applicable. The first is *Blue Coat*, on which both parties rely. There, the court found that the plaintiff's DOE disclosures were boilerplate and generic, like BGI's here. *Blue Coat*, 2015 WL 3640694, at *5. Had the defendant moved earlier to strike the DOE disclosures, the court acknowledged that it likely would have struck the disclosures as violative of the Patent Local Rules. *Id.* But the defendant did not move to strike and the court

United States District Court
Northern District of California

suspected that it may not have because the plaintiff would then "have had the opportunity to seek leave to re-assert the theory with proper factually-based contentions." *Id.* As a result, the court could not "overlook the timing" of the defendants' motion, which came "after the close of discovery," similar to Illumina's motion. *Id.* The defendant explained that because the plaintiff did not supplement its infringement contentions even after it received its confidential information, it understood that the plaintiff would not pursue a theory of infringement under DOE. *Id.* But the court rejected this explanation and held that the defendant should have provided some notice of the deficiencies in the plaintiff's disclosures so that the plaintiff "would be on notice of the deficiency and would fail to supplement at its own risk. Instead, Defendant played the (apocryphal) ostrich, burying its head in the sand until it was safe to raise the issue." *Id.*

The second case is *Verinata Health*, where the court found that the defendant should have expressly stated in its infringement contentions what obviousness combinations it was asserting, even though it was clear from the claim charts that the prior art reference was part of the obvious combination. *Verinata Health*, 2014 WL 4100638, at *6. The court, however, held that "if the claim charts caused [the plaintiff] to suffer any confusion as to what particular obviousness combinations were being asserted, then the proper recourse would have been for [the plaintiff] to compel [the defendant] to amend its invalidity contentions, not for [the plaintiff] to wait until expert discovery and then move to strike the expert report." *Id.*

Illumina contends that it had repeatedly told BGI that it believed BGI's infringement theories were "new" and therefore BGI "failed to supplement [its disclosures] at its own risk." *See Blue Coat*, 2015 WL 3640694, at *5. *Blue Coat*, however, does not address the situation where the moving party had provided notice about the allegedly inadequate infringement contentions but the non-moving party had refused to acknowledge that its disclosures were insufficient. *Verinata Health* is more analogous. If Illumina suffered any confusion concerning what infringement contentions were being asserted, then "the proper recourse" would have been for Illumina to compel BGI to amend its infringement contentions, not to wait until after expert discovery to move to strike the Puglisi Report. *See Verinata Health*, 2014 WL 4100638, at *6. Illumina knew of the Double-Stranded DNA theory in July 2020. Although the Pass Filter theory was not

12

disclosed in the July 2020 email, it is linked to the Double-Stranded DNA theory as "additional evidentiary proof showing that the accused element did in fact practice the limitation," *Blue Coat* 2015 WL 3640694, at *2.

Illumina's motion to strike the Double-Stranded DNA theory and the Pass Filter theory after the close of fact and expert discovery is untimely.  Fact discovery closed on March 26, 2021 and expert discovery closed on May 28, 2021.  *Illumina II*, Dkt. No. 249 at 2.  Illumina did not file the present motion until June 16, 2021.  Although it asserted that BGI's theories were allegedly new in its interrogatory responses, it never sought supplemental briefing or clarification nor moved to compel BGI to amend its contentions.  *See* MTS Opp. at 8.  It notified BGI that it intended to move to strike the Puglisi Report in April 2021, but it did not move to strike then either.  Dkt. No. 389-10 ("Sawyer April 19, 2021 Email"); *see also* Dkt. No. 389-11 ("Tigchelaar April 22, 2021 Email") (BGI responding that its infringement contentions were sufficient and pointing Illumina to the July 2020 email exchange).  It waited a full year after the close of fact discovery and a few weeks after the close of expert discovery to file its motion to strike, burying its head in the sand until it was safe to raise the issue of the Double-Stranded DNA and Pass Filter theories with the court.  *See Blue Coat*, 2015 WL 3640694, at *5.  I will not strike those theories from the Puglisi Report. [2]

As for the DOE theories, BGI argues that the present case is analogous to *Blue Coat* and that because Illumina did not object to the adequacy of BGI's DOE contentions, Illumina's motion should be denied.  MTS Opp. at 19.  But as Illumina contends, it "did put BGI on notice that it had set forth no viable doctrine of equivalents theory" in its June 30, 2020, email, which "applied to the entire infringement theory set forth in BGI infringement contentions."  MTS Reply at 401.

---

[2] Illumina contends that no showing of prejudice is required "because prejudice is inherent in the assertion of a new theory after discovery has closed."  *Adobe Sys. Inc. v. Wowza Media Sys.*, No. 11-CV-02243-JST, 2014 WL 709865, at *15, n.7 (N.D. Cal. Feb. 23, 2014).  But "the same does not pertain to insufficiently supported but nevertheless previously disclosed theories."  *Blue Coat*, 2015 WL 3640694, at *6.  Although BGI did not disclose its Double-Stranded DNA theory in its original infringement contentions, it disclosed the theory to Illumina in the July 2020 email.  As a result, there is no prejudice to denying Illumina's motion for the Double-Stranded DNA and Pass Filter theories because Illumina had the full opportunity to depose Puglisi and respond to his opinions through its expert Weinstock's rebuttal report during expert discovery.  *See* Dkt. No. 376-8 ("Weinstock Reb.") ¶ 59.

1   Unlike with the Double-Stranded DNA theory, BGI did not respond that its DOE theories were

2   sufficient; Illumina was unaware of the DOE theories until the Puglisi Report.  The DOE theories

3   are struck from Puglisi's report.  Accordingly, Illumina's motion to strike is GRANTED in part

4   and DENIED in part.

## II.     MOTION FOR SUMMARY JUDGMENT

### A.     Noninfringement of the '984 Patent

Illumina moves for summary judgment on BGI's infringement claims against Illumina

under the '984 Patent.  "Summary judgment of no literal infringement is proper when, construing

the facts in a manner most favorable to the nonmovant, no reasonable jury could find that the

accused system meets every limitation recited in the properly construed claims."  *Catalina*

*Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 812 (Fed. Cir. 2002).

The only claim element at issue is the requirement that "more than 50% of the DNA

binding regions in the array have multiple copies of one single DNA of said more than $10^5$

different DNAs."  '984 Patent 75:26-28; Dkt. No. 388 ("Opp.") at 3.  Both parties agree that in my

Claim Construction Order I construed this element to require that "more than 50% of the DNA

binding regions in the array are occupied by a single DNA molecule comprising multiple copies of

only one" DNA sequence.  Order at 17.  BGI asserts that under this construction, this element has

two principal features:  (1) the DNA binding region is occupied by a single DNA molecule having

multiple copies of only one DNA sequence; and (2) the DNA molecule having multiple copies is

found in more than 50% of the DNA binding regions.  Opp. at 3.

Illumina argues that the evidence shows that no reasonable jury would find that Illumina

infringes either of these elements, both of which are independent reasons that preclude

infringement as a matter of law.  Mot. at 6.  BGI asserts that there is ample evidence for a jury to

conclude that Illumina infringed the '984 Patent and at a minimum, that there are genuine disputes

of multiple facts.  Opp. at 3.

### 1.     Illumina's Two Different Mechanisms For its Accused Products

As a preliminary matter, BGI contends that Illumina has two distinct mechanisms for how

its Accused Products work and that there are factual disputes that are not appropriate to resolve at

the summary judgment stage.  Opp. at 4.  Under the first mechanism (the one that BGI emphasizes and the one portrayed in Illumina's public materials), during Illumina's "exclusion amplification" ("ExAmp") process, individual DNA fragments are bound to the patterned flow cell and amplified.  Opp. at 4.  During cluster generation, the ExAmp process involves a rapid amplification as soon as the first template DNA seeds a particular nanowell.  *Id.*  Rapid amplification of this single template DNA means that all of the oligonucleotides are quickly saturated, thereby excluding other template DNAs from binding and amplifying in the same nanowell.  *Id.*  BGI's expert, Puglisi, explains that this exclusion process ensures that the number of wells with "purely monoclonal" clusters generated from a single template DNA is maximized.  Opp. at 4 (citing Puglisi Rep. ¶ 156).

Under the second mechanism (the one asserted in Illumina's motion for summary judgment), clusters of single-stranded DNA ("ssDNA") molecules are generated in the nanowells through *in situ* amplification of template DNA molecules that bind to oligonucleotide primers attached to the surface of each nanowell.[3]  Mot. at 5.  The process of *in situ* amplification includes both:  (1) "seeding" or the attachment of the ssDNA templates to the oligonucleotide primers on the surface of the cell; and (2) "cluster generation" or the repeated process of generating a strand complementary to the DNA template strand to create a double-stranded DNA ("dsDNA") and denaturing it to allow for the now two separate ssDNAs to then be further copied.  *Id.*  Once all of the DNA is denatured and left single-stranded, the result is a "cluster" of ssDNA, which consists of copies of any DNA template strands that were "seeded" in the nanowell and their complementary strands.  *Id.*  This allows for sequencing by synthesis to be performed on the DNA fragments within the nanowells.  *Id.*

Most of the nanowells will contain several different sequences because multiple template DNA strands were "seeded" during the initial step.  Mot. at 5.  This occurs because a single dsDNA only binds to one of the many oligonucleotide primers in the nanowell and does not exclude other template ssDNA strands from attaching to other oligonucleotide primers.  *Id.*  But

---

[3] This is the noninfringement argument in Illumina's October 13, 2020, interrogatory response that BGI alleged was "new."  MTS Opp. at 18.

United States District Court
Northern District of California

United States District Court
Northern District of California

according to BGI's expert, Puglisi, the results are "effectively monoclonal" clusters.  Puglisi Rep. ¶ 129.  "Clusters that are 'effectively monoclonal' may have a mixture of DNA template sequences, but the amount of the minor DNA sequences is sufficiently low that it does not interfere with the detection and analysis of the dominant sequence."  Puglisi Rep. ¶ 129.

Next, the original template DNA strands or their complementary strands that were created as part of the amplification process are cleaved and washed away.  Mot. at 5.  This is done because the template DNA and complementary copies have different sequences and would produce interfering signals during the sequencing detection.  *Id.*  An algorithm is used to interpret the mixed signals received from each nanowell, and determine whether there is a sufficiently dominant signal among the different sequences from which a sequence can be determined.  *Id.*  If there is a sufficiently dominant signal determined from the nanowell after the algorithm processes the data, the nanowell is determined to "pass filter" and the data is used to determine the sequence of the dominant signal in the cluster.  *Id.*

### 2. BGI's Infringement Arguments Under Both Mechanisms

Under the first mechanism, BGI contends that Illumina's Accused Products infringe its '984 Patent in two scenarios:  (1) after the initial replication step; and (2) after replication through bridge amplification.  Opp. at 5.  After the initial replication step, the cluster generation process begins when a template DNA molecule is introduced into the nanowell and hybridizes to an oligonucleotide present on the surface.  *Id.*  Polymerase copies the original template DNA to form a dsDNA molecule that comprises two copies of one template sequence.  *Id.*  After the initial replication step, the nanowell is occupied by a single DNA molecule comprising two copies of the DNA template sequence and thereby infringes the '984 Patent.  *Id.*; '984 Patent 75:26–27 (claim limitation requires that "more than 50% of the DNA binding regions in the array are occupied by a single DNA molecule comprising multiple copies of only one single DNA.").  After replication through bridge amplification, a double stranded structure is formed, which is a single DNA molecule comprising two copies of the DNA template sequence.  *Id.*  As a result, a high percentage of nanowells are occupied by clusters originating from a single template.  *Id.*

Under the second mechanism, BGI contends that the amplification progresses through the

same intermediate DNA molecules discussed above that have multiple copies of one DNA.  Opp.

at 7.  Rapid amplification of the first template DNA "out of the gate" means that copies of the first

DNA will rapidly bind to and saturate the oligonucleotides in the nanowell, thereby excluding

other DNA templates from amplifying in the same well.  *Id.*  During this process, the cluster

generation takes advantage of the "saturation/exclusion (single occupancy) principle" of the '984

Patent, i.e., the rapid saturation of all of the oligonucleotide binding sites in a particular DNA

binding region ensuring that the DNA binding region will be occupied by a single DNA molecule.

*Id.*; *see* '984 Patent at 16:27-29.

### 3. Whether Illumina's Accused Products Infringe the Following Claim Element:  "The DNA Binding Region is Occupied by a Single DNA Molecule Having Multiple Copies of One DNA Sequence"

The first dispute is whether the double-stranded DNA ("dsDNA") in Illumina's Accused

Products contains two different sequences or one single sequence.  BGI only accuses the dsDNA

attached to the DNA binding region as infringing the "multiple copies of one single DNA"

limitation.  Dkt. No. 377-4 ("Puglisi Tr.") at 162:17-21.  The Claim Construction Order explains

that the '984 Patent requires only one DNA sequence under the claim limitation at issue, "more

than 50% of the DNA binding regions in the array have multiple copies of one single DNA":

> "The language 'one *single* DNA' indicates that one, and only one, DNA sequence is present in each binding region.  Were BGI's interpretation correct that additional, different DNAs could also be present, the inventor could have written 'one DNA' or 'at least one DNA' of the 100,000 or more different DNAs.  The use of the term 'one single' is clear:  only one DNA sequence is present."

Order at 18 (emphasis in original).

Illumina asserts that the Accused dsDNA contains two different sequences, i.e., a template

sequence and its complementary sequence.  Mot. at 6.  For example, because adenine ("A")

always pairs with thymine ("T") and guanine ("G") always pairs with cytosine ("C"), a template

sequence of A-G-G-T would have a complementary sequence T-C-C-A.  According to Illumina,

"Whether one sequence could be generated or determined from its complementary sequence is

irrelevant.  They are still different sequences."  Mot. at 7.  It also explains that the Accused

dsDNA are only present during the intermediate steps before cluster generation is completed and

United States District Court
Northern District of California

are not sequenced in the Accused Flow Cells because the dsDNA contain different sequences.

Mot. at 8.  Otherwise, the presence of both strands of dsDNA, i.e., the different sequences, would

produce conflicting signals during sequencing.  *Id.*

BGI contends that the question of whether dsDNA comprises of a single DNA sequence or

different DNA sequences is a genuine issue of material fact.  Opp. at 8.  According to BGI, a

person of ordinary skill in the art ("POSITA") would understand that a dsDNA molecule includes

two complementary copies of a single DNA sequence and the claim element referring to "multiple

copies of one single DNA" encompasses such complementary copies.  *Id.*; *see* Puglisi Rep.

¶¶ 172–74.  But BGI's infringement expert, Puglisi admitted during his deposition that the two

strands of dsDNA are different sequences:

> "Q: Do you see the image on the left of the double-stranded DNA?"
> A:  Yes I do.
> Q:  Are those two sequences the same or different?
> A:  They're complementary to one another.
> Q:  So would you say they are the same or different?
> A: They are different sequences, but are complements of one another through the rules of Watson-Crick base pair.
> Q:  So you agree with the text above the figure that says the composition of the bases are different, correct?
> A:  In the two strands they are different."

Puglisi Tr. at 9:20–10:7.

Accordingly, even if I drew all reasonable inferences in BGI's favor, there is no genuine

dispute of fact that the dsDNA comprises of two different sequences.  Due to the presence of the

second strand in the dsDNA with a different, albeit complementary, sequence, Illumina's Accused

Products cannot infringe this limitation in the '984 Patent.  Whether Illumina's Accused Products

create a purely monoclonal cluster or an effectively monoclonal cluster under the first or second

mechanisms is also irrelevant because both mechanisms have the dsDNA with two different

sequences.  *See* Dkt. No. 400 ("Reply") at 6.  Because all of BGI's infringement theories rely on a

flawed opinion that the Accused dsDNA contain multiple copies of one single DNA sequence,

there is no evidence that Illumina's Accused Products infringe the '984 Patent.[4]  Mot. at 6; Dkt.

---

[4] I will not address the disputes about the "occupied" requirement in the first element or about the
second element.  Even if there were genuine disputes of fact, it would not change the
noninfringement conclusion because Illumina's Accused Products cannot satisfy the "one DNA

United States District Court
Northern District of California

No. 387-12 Puglisi Rep. ¶¶ 119–28.  Illumina's motion for summary judgment on the noninfringement of the '984 Patent is GRANTED.

### B.     Doctrine of Equivalents

As established above, BGI has not preserved its DOE theories in its infringement contentions and therefore there can be no infringement under DOE.  *See supra* Part I.A.3.  Even if BGI had sufficiently disclosed its DOE theories, the DOE analysis is flawed because it fails to compare the accused features to the claim limitations.[5]  *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997) (DOE requires showing "'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention.").  "If an asserted claim does not literally read on an accused product, infringement may still occur under the doctrine of equivalents if there is not a substantial difference between the limitations of the claim and the accused product."  *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1250 (Fed. Cir. 2000).  "Insubstantiality may be determined by whether the accused device 'performs substantially the same function in substantially the same way to obtain the same result' as the claim limitation."  *Catalina Marketing*, 289 F.3d at 813.  "Such evidence must be presented on a limitation-by-limitation basis.  Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice."  *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996).

Illumina asserts that BGI's DOE analysis is untied to any claim element.  Mot. at 14.  In the DOE analysis, Puglisi addresses Illumina's contention that "effectively monoclonal" clusters under the second mechanism do not infringe the "more than 50%" element of the asserted claims.  Opp. at 16; Puglisi Rep. ¶¶ 150, 165–68.  He opines that "effectively monoclonal clusters are insubstantially different from purely monoclonal clusters for purposes of DNA sequencing with the claimed patterned flow cells" but the patent does not mention or encompass clusters whether

sequence" requirement in the first element.

[5] Because I conclude that the DOE theories have not been sufficiently disclosed and are flawed, I will not address the question of whether the DOE claim is barred as a matter of law by prosecution history estoppel.

United States District Court
Northern District of California

"purely monoclonal" or "effectively monoclonal." *Id.*; *see* Puglisi Rep. ¶ 167. The Claim Construction Order rejected BGI's construction that "would contemplate clusters of the macromolecules per binding site," which would "diminish[] a key benefit of the high-density array." Claim Construction Order at 21.

In addition, the DOE analysis does not provide a limitation-by-limitation basis for the alleged insubstantiality between the Accused Products and the claim limitation. The Puglisi Report does not specifically address how "clusters" containing multiple molecules are equivalent to a single molecule or the equivalency to the "occupied" limitation. Mot. at 14; Dkt. No. 407 at 32; *see* Puglisi Rep. ¶¶ 150, 165–68. Moreover, BGI's literal infringement theory is based on the transient "intermediate DNA structures" that are "formed during cluster generation," and not the clusters themselves, but BGI does not have a DOE theory on these intermediate structures. *See* Opp. at 5–6; Reply at 7. Accordingly, BGI's DOE theories fail and there can be no infringement of the '984 Patent under DOE.[6]

### C.    Inequitable Conduct

The parties contest whether two of Illumina's inventors of the '444 and '973 patents, Dr. Xiaohai Liu and Xiaolin Wu, deliberately concealed a reference (the "Kovács" reference) from the Patent and Trademark Office ("PTO") during the prosecution of the '444 and '973 Patents. "To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011). In a case involving nondisclosure of information, like the one here, "the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Id.* at 1290. The evidence of intent "must be the single most reasonable inference able to be drawn from the evidence." *Id.* "[W]hen there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found . . . ." *Id.*

---

[6] I will not address the royalty base dispute about whether there is evidence of infringement of certain Accused Products included in BGI's royalty base for damages because I conclude that there can be no infringement under the '984 Patent.

1    BGI alleges that Illumina intentionally withheld or failed to disclose a reference to a paper by

2    Terez Kovacs and Laslo Otvos titled *Simple Synthesis of 5-Vinyl and 5-Ethynyl- 2'*

3    *Deoxyuridine-5'-Triphosphates*, and published in Tetrahedron Letters, Vol. 29, pp 4525-4528, 1988

4    ("Kovacs").  *See* Dkt. No. 233-7 ("Kovács").  It states that Kovács discloses a methodology for

5    converting nucleosides to nucleotides that is very similar to the method that Liu and Wu were using to

6    create modified nucleotides.  FAA ¶ 337.  It claims that Liu and Wu copied the specific methodology

7    used in Kovács but did not disclose Kovács as relevant prior art.  *Id.*

8    Illumina answers that BGI's "inequitable conduct" defense fails as a matter of law because

9    there is no evidence that the inventors had specific intent to deceive the PTO.  Mot. at 2–3.  For

10   the reasons below, even if I drew all inferences in BGI's favor, I cannot reasonably conclude that

11   the inventors had specific intent to deceive the PTO and therefore BGI's inequitable conduct

12   defense fails.

13                       **1.       Whether the '984 Inventors Knew About the Kovács Reference**

14   Notwithstanding Drs. Wu and Liu's declarations that they did not know about the Kovács

15   reference, BGI contends that Dr. Sarah Lee, a colleague of the inventors, cited Kovács in a

16   notebook as the methodology that she and Drs. Liu and Wu used for phosphorylation.  Opp. at 20.

17   Because these three worked on the same phosphorylation methodology, "worked shoulder-to-

18   shoulder at the lab bench," and "talked every day about their work," BGI argues that it is not the

19   "most reasonable to believe the inventors knew nothing about Kovács."  *Id.*  But as Illumina

20   emphasizes, there are no citations to Kovács in any of the inventors' lab notebooks.  Mot. at 17.

21   Instead, the inventors have testified that they do not remember having ever seen the Kovács

22   reference; BGI's experts admitted that there was no evidence that the inventors were aware of the

23   Kovács reference.  *See* Dkt. No. 377-8 ("Wu Decl.") ¶ 5; Dkt. No. 377-9 ("Liu Decl.") ¶ 5; 1465 Dkt.

24   239-6 ("Wu Tr.") at 287:14-20; Dkt. No. 377-11 ("Metzker Tr.") at 245:19–246:4.

25   BGI contests Illumina's defense that its inventors developed their phosphorylation method

26   from references other than Kovács.  Opp. at 21.  Its expert, Dr. Patrick Hrdlicka, compared the

27   chemical synthesis steps that Kovács teaches to phosphorylate nucleosides with what the inventors

28   used and disclosed in their patents and concluded that the inventors must have known about

United States District Court
Northern District of California

21

United States District Court
Northern District of California

Kovács.  *See* Dkt. No. 386-46 ("Hrdlicka Rep.") ¶¶ 208–39.  According to BGI, "At the very least, there is a dispute between the experts as to whether the similarities between Kovács and what the inventors did and disclosed establishes that they knew about and used Kovács as a guide for their work" rendering summary judgment inappropriate.  Opp. at 22.  But as Illumina correctly notes, raising a factual dispute is not enough to foreclose the other reasonable inferences and prove that intentional deceit is the single most reasonable inference.  Reply at 12.

For example, Illumina asserts that another reasonable inference is that Lee could have simply communicated "a common proton sponge protocol (what BGI calls the Kovács methodology) to Drs. Wu and Liu without communicating where the proton sponge protocol was published."  Reply at 10; Mot. at 17–18.  BGI contends that this speculation is implausible because there "is no reason Dr. Lee would have concealed the copy of Kovacs she was referencing from Drs. Wu and Liu, who were working right next to her."  Opp. at 21.  Illumina responds that at Lee's previous job, Lee had performed extensive work on phosphorylation protocols similar to the protocol in Kovács.  Dkt. No. 377-15 ("Romesberg Rep.") ¶ 355.  Based on her prior experience and publications, Lee could have explained the phosphorylation protocol to her colleagues without needing to reference or share any specific literature.  *Id.*  Illumina argues that this inference is more reasonable than BGI's "speculation that the inventors would have seen all literature cited in Dr. Lee's lab notebook just because they were working in the same laboratory."  Reply at 10.

### 2.   Whether the Inventors Thought the Kovács Reference Was Material

In addition, Illumina asserts that because there is no evidence that any inventor had ever seen Kovács, BGI's theory that the inventors believed that the reference was material to the claimed invention is "even more far-fetched."  Mot. at 19.  Even if the inventors had seen Kovács, Illumina argues that there is no evidence to show that the inventors would have thought it was material to the claims because (1) the fields of technology were different; (2) BGI itself did not recognize the materiality of the Kovács reference; and (3) Kovács was merely cumulative of other prior art.  Mot. at 19–20.  BGI contends that Kovács is material, as evidenced by the fact that Lee cited to it in her lab notebook and that Kovács is more relevant than the other prior art references,

which Illumina did disclose.  Opp. at 22–23.  Illumina, however, maintains that Kovács "has nothing to do with sequencing or the azido blocking group."  Reply at 11.

### 3. Whether the Inventors Had Specific Intent to Deceive the PTO

Even if the inventors knew about Kovács and believed it was material, "[d]espite extensive discovery that involved over 50 hours of inventor depositions and combing through over 300 lab notebooks, BGI has no evidence from which a reasonable fact finder could conclude that the inventors deliberately withheld Kovacs with a specific intent to deceive the PTO."  Mot. at 20.  BGI's experts admitted this.  Metzker Tr. at 414:6-14 ("I have no knowledge of the [sic] intentionability of any of the inventors in this case.  I don't know what their intentions are.  I'm not saying they had any malice intentions"); *id.* at 417:1-14 ("I don't have any knowledge of what they purposefully did or not purposefully did in the laboratory . . . whether they attempted to hide or not hide purposefully. I wouldn't know that"); Dkt. No. 377-12 ("Hrdlicka Tr.") at 14:6–15:10 ("I have not formulated any opinions or conclusions regarding whether or not the inventors had malicious intent in withholding information from the patent office . . . I cannot speculate to what was going on in the mind of . . . inventors").

But "because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence, provided that such intent is the single reasonable inference."  *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 768 F.3d 1185, 1190–91 (Fed. Cir. 2014).  BGI contends that a possible motive for withholding knowledge of the Kovács reference could have been to ensure that they could still claim to be inventors and therefore this motive creates a reasonable inference that the inventors did have a specific intent to deceive the PTO by withholding Kovács.  Reply at 23.  According to BGI, Illumina's witnesses are not credible, which is a "crucial" factor in finding specific intent to deceive.  *See* Opp. at 20; *see Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962) ("[S]ummary judgement should be used sparingly where motive and intent play leading roles" to allow credibility of witnesses to be examined on cross examination.).  For example, Drs. Wu and Liu, as well as the six other inventors, which Illumina hired as consultants, testified that Dr. Wu came up with the idea to use the 3'-O azidomethyl block.  Dkt. No. 386-38 ("Romesberg Reb.") ¶¶ 266–69.  But the one inventor who Illumina did not hire as a consultant,

Dr. Milton, testified that he was the one who came up with the idea.  Dkt. No. 386-40 ("Milton Tr.") at 27:24–28:1.

BGI also asserts that Illumina's reasons for not disclosing Kovács are "not credible and part of the scheme to conceal its copying Zavgorodny," a prior art reference which BGI had accused Illumina of concealing until the patent examiner found the reference on his own.  Opp. at 24; *Illumina II*, Dkt. No. 241-4 at 6.  BGI emphasizes that Illumina has argued that Zavgorodny is irrelevant to its invention.  But when pressed, Dr. Liu testified that he found Zavgorodny "very interesting because it had done what the Illumina inventors had done."  Opp. at 24; Dkt. No. 241-4 at 6.  Illumina and its inventors also claim that they did not know about Zavgorodny before they filed their patent applications but an email shows otherwise.  *See* Dkt. No. 386-45.  Because Illumina inventors had a motive to claim that they did not know about Kovács—in order to obtain patent protection—BGI argues that "there is more than enough evidence, given the contradictory facts Illumina relies on, to draw the reasonable inference that the Illumina inventors knew about Kovács, knew it was material, and withheld it from the patent office with a specific intent to deceive."  Opp. at 25.

As Illumina points out, nothing about the Zavgorodny reference was concealed; it was fully disclosed and considered by the PTO.  Reply at 13.  And Milton's testimony that he came up with the idea to use a 3'-O azidomethyl blocking group, while it may (or may not) undermine the credibility of Illumina's witnesses, disproves BGI's theory that the inventors copied the invention from Zavgorodny.  *Id.*  Milton and the other inventors all testified that none of the inventors had seen the Zavgorodny references before.  Milton Tr. at 39:6–40:5; 30:22–31:2; 31:10-22; 34:4-7; 45:5-15; Romesberg Reb. ¶ 291.  Given this record, drawing all reasonable inferences in BGI's favor, I cannot reasonably conclude that the single most reasonable inference for the failure to disclose the Kovács reference to the PTO was to intentionally deceive the PTO. [7]  Illumina's

---

[7] Because I reject BGI's "inequitable conduct" defense, I will not address Illumina's request to strike portions of BGI's expert reports that opine on the inventors' states of mind.  Mot. at 22; *see, e.g.*, Dkt. No. 377-14 ("Metzker Rep.") ¶ 273 (opining that the inventors claimed to have not known anything about [Kovacs], to gain some advantage in the patent prosecution context.").

1    motion for summary judgment on BGI's inequitable conduct defense is GRANTED.

2        **D.      BGI's Other Defenses**

3        Finally, Illumina moves for summary judgment that (1) the Accused StandardMPS

4    products infringe all Asserted Claims of all Asserted Patents; (2) the Accused CoolMPS products

5    infringe the Asserted Claims of the '973 and '444 Patents;[8] (3) the Asserted Claims are not

6    anticipated; and (4) the '444 Patent is not invalid for lack of written description or enablement.

7    Mot. at 23–25.  The first two issues are not rebutted by BGI's expert opinions and BGI's counsel

8    confirmed that its experts did not serve reports on these issues.  Mot. at 24.  In addition, BGI's

9    expert does not assert that any Asserted Claim is anticipated or that the '444 Patent is invalid.  *Id.*

10   at 24–25.  BGI does not contend that there is a genuine issue of material fact.  BGI only asserts

11   that Illumina failed to show there were no disputed issues of fact and that these issues are best

12   addressed during the preparation of pre-trial submissions.  Opp. at 25.  I disagree and GRANT

13   summary judgment in favor of Illumina on these four uncontested defenses.

14   **III.   MOTIONS TO SEAL**

15       The parties have filed ten motions to seal.  *See* 1465 Dkt. Nos. 406, 421, 433, 448; 3770

16   Dkt. Nos. 376, 378, 386, 387, 399, 412.  A party seeking to seal court records must overcome a

17   strong presumption in favor of the public's right to access those records.  *See Ctr. for Auto Safety*

18   *v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016), *cert. denied sub nom. FCA U.S. LLC*

19   *v. Ctr. for Auto Safety*, 137 S. Ct. 38 (2016).  Here, the "compelling reasons" standard applies.

20   *See id.* at 1101.  The Ninth Circuit has explained that examples of "compelling reasons" include

21   "the use of records to gratify private spite, promote public scandal, circulate libelous statements,

22   or release trade secrets."  *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir.

23   2006).  Other examples include "sources of business information that might harm a litigant's

24   competitive standing."  *Ctr. for Auto Safety*, 809 F.3d at 1097.  For the reasons explained in the

25   table below, the following motions are GRANTED:  3770 Dkt. Nos. 376, 378, 399, 412 and 1465

26   Dkt. Nos. 406, 433, 448.  The following motions are GRANTED in part and DENIED in part:

27   _____

28   [8] In a separate order, I rejected BGI's argument that the '973 Patent was invalid.  *See Illumina II*,
     Dkt. No. 469 at 5–9.

United States District Court
Northern District of California

3770 Dkt. Nos. 386, 387 and 1465 Dkt. No. 421.  The clerk shall UNSEAL 3770 Dkt. Nos.

386-20, 386-22, 386-24, 386-26, 386-28, 386-30, 386-36, 386-44, 387-4, 387-6, 387-8, 387-10

and 1465 Dkt. Nos. 421-20, 421-22, 421-24, 421-26, 421-28, 421-30, 421-36, 421-44.

| Document | Portions to Be Filed Under Seal | Designating Party | Ruling |
|---|---|---|---|
| **3770 Dkt. No. 376 / 1465 Dkt. No. 406 – GRANTED** | | | |
| Illumina's Motion for Summary Judgment | 2:13, 10:7 | Illumina | **GRANTED** (Discusses Illumina's proprietary product information and trade secrets, which if made public could cause harm to Illumina. Dkt. No. 376-1 ¶ 6.) |
| Exhibit 1 to the Declaration of Andrew Gesior in Support of Illumina's Motion for Summary Judgment (2021-04-12  Opening Expert Report of Joseph Puglisi Ph.D.) | ¶¶127-128, 146, 165-167 | Illumina | **GRANTED** (Discusses Illumina's proprietary product information and trade secrets, which if made public could cause harm to Illumina. Dkt. No. 376-1 ¶ 6.) |
| Exhibit 2 to the Declaration of Andrew Gesior in Support of Illumina's Motion for Summary Judgment (2021-05-10 George Weinstock's Rebuttal Report re Noninfringement of U.S. Patent No. 9,944,984) | ¶¶ 37-41, 43-58, 59 n.7, 60-63 | Illumina | **GRANTED** (Discusses Illumina's proprietary product information and trade secrets, which if made public could cause harm to Illumina. Dkt. No. 376-1 ¶ 6.) |
| Exhibit 5 to the Declaration of Andrew Gesior in Support of Illumina's Motion for Summary Judgment (2021-01-22 Deposition Transcript of Sergio Peisajovic) | 111:9-15, 111:21-22, 112:13-14 | Illumina | **GRANTED** (Discusses Illumina's proprietary product information and trade secrets, which if made public could cause harm to Illumina. Dkt. No. 376-1 ¶ 6.) |
| Exhibit 16 to the Declaration of Andrew Gesior in Support of Illumina's Motion for | ¶¶ 63-66, 84-85, 93, 97, 99, 110-111, 116-117, 149-150, 154, 175, 183, | BGI | **GRANTED** (Discusses BGI's trade secrets and confidential information regarding its products, chemical reagents, and R&D, which if |

| | | | |
|---|---|---|---|
| Summary Judgment (2021-04-12 Expert Report of Floyd Romesberg Ph.D. re Infringement) | 186-187, 196, 204, 207-208, 234, 263, 266, 269, 272, 275, 278, 305, 318, 347, 363, 393, 407, 423, 427, 432, 440, 447, 457, 460-461, 464, and 469-470, and n.10, n.13, and n.15 (highlighted in yellow) | | made public could harm its competitive standing.  3770 Dkt. No. 383 ¶ 4.) |
| Exhibit 17 to the Declaration of Andrew Gesior in Support of Illumina's Motion for Summary Judgment (2021-05-10 Rebuttal Expert Report of Michael Metzker Ph.D. re Noninfringement) | ¶ 10 (highlighted in yellow) | BGI | **GRANTED** (Discusses BGI's trade secrets and confidential information regarding its products, chemical reagents, and R&D, which if made public could harm its competitive standing.  3770 Dkt. No. 383 ¶ 4.) |
| Exhibit 18 to the Declaration of Andrew Gesior in Support of Illumina's Motion for Summary Judgment (2021-04-12 Opening Expert Report of James Kearl) | ¶ 95 | Illumina | **GRANTED** (Discusses Illumina's confidential, non-public financial information, such as sales and revenue data, which if made public could cause harm to Illumina.  Dkt. No. 376-1 ¶ 7.) |
| **3770 Dkt. No. 386 / 1465 Dkt. No. 421 – GRANTED IN PART AND DENIED IN PART** | | | |
| Defendants' Opposition to Illumina's Motion for Summary Judgment | • Portions of p. 4<br>• Portions of p. 25 | Illumina | **GRANTED** (Discusses Illumina's proprietary product information and trade secrets, which if made public could harm Illumina.  3770 Dkt. No. 396 ¶ 8.) |
| Ex. 2 - April 12, 2021 Expert Report of Joseph D. Puglisi, Ph.D. | • Portions of ¶ 66<br>• Portions of ¶¶ 70-71<br>• Portions of ¶ 74<br>• Portions of ¶ 76<br>• Portions of ¶ 80<br>• Portions of ¶ 83<br>• Portions of ¶¶ 104-109<br>• Portions of ¶¶ 127-128<br>• Portions of ¶ 152<br>• Portions of ¶¶ 159-160<br>• Portions of ¶¶ 165-167 | Illumina | **GRANTED** (Discusses Illumina's confidential, non-public information regarding its third-party licensing agreements as well as its proprietary product information and trade secrets. 3770 Dkt. No. 396 ¶¶ 7–8.) |

United States District Court
Northern District of California

| | | | |
|---|---|---|---|
| | • Portions of ¶ 171<br>• Portions of<br>¶¶ 184-187 | | |
| Ex. 3 - Ex. 3 to Puglisi Report<br>(Claim Chart) | • Portions of p. 4<br>• Portions of p. 6-11<br>• Portions of p. 18-21<br>• Portion of p. 27<br>• Portions of p. 29-32 | Illumina | **GRANTED**<br>(Discusses Illumina's proprietary product information and trade secrets, which if made public could harm Illumina.  3770 Dkt. No. 396 ¶ 8.) |
| Ex. 4 - Excerpts from the May 28, 2021 deposition transcript of<br>George M. Weinstock, Ph.D. | • p. 7:22<br>• p. 66:16-24<br>• p. 67:4-9; 12-14; 16-23; 25<br>• p. 68:19-21; 23-25<br>• p. 69:1-3; 5-6<br>• p. 83:24-35<br>• p. 84:1-13; 15-25<br>• p. 85:1-14<br>• p. 97:10-11; 13-25<br>• p. 98:1-7; 9-11; 13-16; 18-20; 25<br>• p. 101:2-5; 7-25<br>• p. 102:2-5; 7-9; 11-17; 22-23<br>• p. 103:13 | Illumina | **GRANTED**<br>(Discusses Illumina's proprietary product information and trade secrets and contains the home addresses of third-party witnesses.  3770 Dkt. No. 396 ¶¶ 8–9.) |
| Ex. 6 - Excerpts from the January 22, 2021 deposition transcript of Sergio Peisajovich, Ph.D. | • p. 145: 1-7; 9-11; 18-21;25<br>• p. 146: 1-2; 5-8; 10-19; 21-22; 24-25<br>• p. 153: 1-4; 8-12; 14-20; 22-25<br>• 174:12-16 | Illumina | **GRANTED**<br>(Discusses Illumina's proprietary product information and trade secrets, which if made public could harm Illumina.  3770 Dkt. No. 396 ¶ 8.) |
| Ex. 7 - Excerpts from the March 18, 2021 deposition transcript of<br>Peter McInerney, Ph.D. | • p. 9: 1-2<br>• p. 95:2-16; 24-25<br>• p. 96:1-6 | Illumina | **GRANTED**<br>(Discusses Illumina's proprietary product information and trade secrets and contains the home addresses of third-party witnesses.  3770 Dkt. No. 396 ¶¶ 8–9.) |
| Ex. 12 - Excerpts from the May 25, 2021 deposition transcript of Joseph D. Puglisi, Ph.D. | • p. 6:20<br>• p. 171:9-16<br>• p. 186:6-9; 15-17<br>• p. 187:4-7 | Illumina | **GRANTED**<br>(Discusses Illumina's proprietary product information and trade secrets and contains the home addresses of third-party witnesses.  3770 Dkt. No. 396 ¶¶ 8–9.) |
| Ex. 14 - Excerpts from the April 12, 2021 Expert Report | • Portions of ¶¶ 54-62<br>• Portions of | Illumina | **GRANTED**<br>(Discusses Illumina's confidential, non-public financial |

United States District Court
Northern District of California

| | | | |
|---|---|---|---|
| of James R. Kearl, Ph.D. | ¶¶ 64-65<br>• Portions of ¶ 85<br>• Portions of ¶ 95<br>• Portions of fn. 128<br>• Portions of fn. 135 | | information regarding its sales, revenue data, IP portfolio, and business development.  Also discusses its proprietary product information and trade secrets. 3770 Dkt. No. 396 ¶¶ 7–8.) |
| Ex. 15 - Excerpts from the May 10, 2021 Rebuttal Expert Report of George M. Weinstock, Ph.D. | N/A | Illumina | **DENIED – The court shall unseal 3770 Dkt. No. 386-20 and 1465 Dkt. No. 421-20.**<br>(Illumina does not seek to seal this document.  3770 Dkt. No. 396.) |
| Ex. 18 - Excerpts of the document produced bearing Bates numbers ILMNBGI0207713 | N/A | Illumina | **DENIED – The court shall unseal 3770 Dkt. No. 386-22 and 1465 Dkt. No. 421-22.**<br>(Illumina does not seek to seal this document.  3770 Dkt. No. 396.) |
| Ex. 19 - Excerpts of the document produced bearing Bates numbers ILMNBGI_NDCAL0003471 | N/A | Illumina | **DENIED – The court shall unseal 3770 Dkt. No. 386-24 and 1465 Dkt. No. 421-24.**<br>(Illumina does not seek to seal this document.  3770 Dkt. No. 396.) |
| Ex. 20 - Excerpts of the document produced bearing Bates numbers ILMNBGI0203644 | N/A | Illumina | **DENIED – The court shall unseal 3770 Dkt. No. 386-26 and 1465 Dkt. No. 421-26.**<br>(Illumina does not seek to seal this document.  3770 Dkt. No. 396.) |
| Ex. 21 - Excerpts of the document produced bearing Bates numbers ILMNBGI0203857 | N/A | Illumina | **DENIED – The court shall unseal 3770 Dkt. No. 386-28 and 1465 Dkt. No. 421-28.**<br>(Illumina does not seek to seal this document.  3770 Dkt. No. 396.) |
| Ex. 22 - Excerpts from the January 7, 2021 deposition transcript of Joseph Samuel Brennan, Ph.D. | N/A | Illumina | **DENIED – The court shall unseal 3770 Dkt. No. 386-30 and 1465 Dkt. No. 421-30.**<br>(Illumina does not seek to seal this document.  3770 Dkt. No. 396.) |
| Ex. 23 Excerpts from the April 12, 2021 Opening Expert Report of Michael L. Metzker, Ph.D. | • Portions of ¶ 247<br>• Portions of ¶ 263 | Illumina | **GRANTED**<br>(Discusses Illumina's proprietary product information and trade secrets, which if made public could harm Illumina.  3770 Dkt. No. 396 ¶ 8.) |
| Ex. 26 - Excerpts of the document | • Portions of p. 1979/ILMNBGI0 | Illumina | **GRANTED**<br>(Discusses Illumina's proprietary |

29

| produced bearing beginning Bates numbers ILMNBGI0213690 | 213692<br>• Portions of p. 1981-1984/ILMNBGI0213694-697 | | product information and trade secrets, which if made public could harm Illumina. 3770 Dkt. No. 396 ¶ 8.) |
|---|---|---|---|
| Ex. 29 - Excerpts from the May 24, 2021 deposition transcript of Floyd Romesberg, Ph.D. | N/A | Illumina | **DENIED – The court shall unseal 3770 Dkt. No. 386-36 and 1465 Dkt. No. 421-36.**<br>(Illumina does not seek to seal this document. 3770 Dkt. No. 396.) |
| Ex. 30 - Excerpts from the May 10, 2021 Expert Rebuttal Report of Floyd Romesberg, Ph.D. on Validity | N/A | Illumina | **DENIED – The court shall unseal 3770 Dkt. No. 386-38 and 1465 Dkt. No. 421-38.**<br>(Illumina does not seek to seal this document. 3770 Dkt. No. 396.) |
| Ex. 31 - Excerpts from the January 15, 2021 deposition transcript of John Milton, Ph.D. | p. 8:3-4 | Illumina | **GRANTED**<br>(Contains the home addresses of third-party witnesses. 3770 Dkt. No. 396 ¶ 9.) |
| Ex. 32 - Exhibit 0075 from the December 8, 2020 deposition of Shankar Balasubramanian, Ph.D. | Entire document | Illumina | **GRANTED**<br>(Discusses Illumina's non-public working draft regarding its strategic publication of information related to its technology, which if made public could harm Illumina. 3770 Dkt. No. 396 ¶ 8.) |
| Ex. 33 - Excerpts from the August 20, 2020 deposition transcript of Xiaohai Liu, Ph.D. | N/A | Illumina | **DENIED – The court shall unseal 3770 Dkt. No. 386-44 and 1465 Dkt. No. 421-44.**<br>(Illumina does not seek to seal this document. 3770 Dkt. No. 396.) |
| Ex. 34 - Excerpts from the April 12, 2021 Opening Expert Report of Professor Patrick J. Hrdlicka | • Portions of ¶¶ 176-179<br>• Portions of fn. 43 | Illumina | **GRANTED**<br>(Discusses Illumina's proprietary product information and trade secrets, which if made public could harm Illumina. 3770 Dkt. No. 396 ¶ 8.) |
| Ex. 35 - Document produced bearing Bates numbers ILMNBGI1110437-52 | Portions of p. ILMNBGI1110437 | Illumina | **GRANTED**<br>(Discusses Illumina's proprietary product information and trade secrets, which if made public could harm Illumina. 3770 Dkt. No. 396 ¶ 8.) |
| Ex. 36 - Excerpts from the January 14, 2021 deposition transcript of Harold P. Swerdlow, Ph.D. | • Portions of p. 212:9-10: 14<br>• Portions of p. 212:25-213:5<br>• Portions of p. 213:9-10 | Illumina | **GRANTED**<br>(Discusses Illumina's confidential, non-public financial information regarding its sales, revenue data, IP portfolio, and business development. 3770 Dkt. |

United States District Court
Northern District of California

| | | | No. 396 ¶ 7.) |
|---|---|---|---|
| **3770 Dkt. No. 399 / 1465 Dkt. No. 433 – GRANTED** | | | |
| Illumina's Reply in Support of Illumina's Motion for Summary Judgment | Portions of page 5 and 15 | Illumina | **GRANTED** (Discusses Illumina's confidential proprietary product information and trade secrets, which if made public could cause harm to Illumina.  3770 Dkt. No. 399-1 ¶ 4.) |
| Exhibit 22 to the Supplemental Declaration of Andrew Gesior in Support of Illumina's Reply in Support of Illumina's Motion for Summary Judgment (excerpts of the Expert Report of Floyd Romesberg, Ph. D. on Validity served on May 10, 2021) | Portions of ¶¶ 327-328 p. 127, fn. 12 | Illumina | **GRANTED** (Discusses Illumina's confidential proprietary product information and trade secrets, which if made public could cause harm to Illumina.  3770 Dkt. No. 399-1 ¶ 4.) |
| **3770 Dkt. No. 412 / 1465 Dkt. No. 448 – GRANTED** | | | |
| BGI's Prowse Presentation | Green highlighted portions | Defendants | **GRANTED** (Discusses BGI's trade secrets and confidential business information regarding its ongoing R&D activities and expenditures that if made public would harm BGI.  1465 Dkt. No. 448; Dkt. No. 412). |
| BGI's Opposition Presentation | Green highlighted portions of slide 12–13, 35 | Illumina | **GRANTED** (Discusses Illumina's proprietary product information and trade secrets.  3770 Dkt. No. 415; 1465 Dkt. No. 452.) |
| **3770 Dkt. No. 378 – GRANTED** | | | |
| Exhibit 2 to the Declaration of Audra Sawyer in Support of Illumina's Motion to Strike Expert Report of Dr. Joseph Puglisi and Preclude Defendants From Relying On New Infringement Theories (2021-05-10 George Weinstock's Rebuttal Report re Noninfringement of U.S. Patent No. 9,944,984) | ¶¶ 37-41, 43, 47, 50-58, 59 n.7, 60-63 | Illumina | **GRANTED** (Discusses confidential, non-public information such as Illumina's proprietary product information and trade secrets. Dkt. No. 378.) |

United States District Court
Northern District of California

| | | | |
|---|---|---|---|
| Exhibit 4 to the Declaration of Audra Sawyer in Support of Illumina's Motion to Strike Expert Report of Dr. Joseph Puglisi and Preclude Defendants From Relying On New Infringement Theories (2021-04-12 Opening Expert Report of Joseph Puglisi Ph.D.) | ¶¶127-128, 146, 165-167, 171 | Illumina | **GRANTED** (Discusses confidential, non-public information such as Illumina's proprietary product information and trade secrets. Dkt. No. 378.) |
| Exhibit 6 to the Declaration of Audra Sawyer in Support of Illumina's Motion to Strike Expert Report of Dr. Joseph Puglisi and Preclude Defendants From Relying On New Infringement Theories (excerpt of Illumina Powerpoint presentation entitled "ExAmp Clustering") | Entire document | Illumina | **GRANTED** (Discusses confidential, non-public information such as Illumina's proprietary product information and trade secrets. Dkt. No. 378.) |
| **3770 Dkt. No. 387 – GRANTED IN PART AND DENIED IN PART** | | | |
| BGI's Opposition to Illumina's Motion to Strike Puglisi's Expert Opinion | N/A | Illumina | **DENIED – The clerk shall UNSEAL Dkt. No. 387-4.** (Illumina does not request this document to be sealed. Dkt. No. 395.) |
| Ex. 5 – Excerpts from Illumina's October 13, 2020 Responses and Objections to Defendants' Second  Set of Interrogatories  (Nos. 7-16) | N/A | Illumina | **DENIED – The clerk shall UNSEAL Dkt. No. 387-6.** (Illumina does not request this document to be sealed. Dkt. No. 395.) |
| Ex. 6 - Excerpts from Illumina's December 7, 2020 Supplemental Responses and Objections to Defendants' Second Set of  Interrogatories | N/A | Illumina | **DENIED – The clerk shall UNSEAL Dkt. No. 387-8.** (Illumina does not request this document to be sealed. Dkt. No. 395.) |

United States District Court
Northern District of California

United States District Court
Northern District of California

| | | | |
|---|---|---|---|
| Ex. 7 - Excerpts from Illumina's March 26, 2021 Second Supplemental Responses and Objections to Defendants' Second Set of Interrogatories | N/A | Illumina | **DENIED – The clerk shall UNSEAL Dkt. No. 387-10.** (Illumina does not request this document to be sealed.  Dkt. No. 395.) |
| Ex. 8 - April 12, 2021 Expert Report of Dr. Joseph D. Puglisi | <ul><li>Portions of ¶ 66</li><li>Portions of ¶¶ 70-71</li><li>Portions of ¶ 74</li><li>Portions of ¶ 76</li><li>Portions of ¶ 80</li><li>Portions of ¶ 83</li><li>Portions of ¶¶ 104-109</li><li>Portions of ¶¶ 127-128</li><li>Portions of ¶ 152</li><li>Portions of ¶¶ 159-160</li><li>Portions of ¶¶ 165-167</li><li>Portions of ¶ 171</li><li>Portions of ¶¶ 184-187</li></ul> | Illumina | **GRANTED** (Discusses Illumina's confidential, non-public information related to its third-party licensing agreements, trade-secrets, and proprietary information, which if made public could cause harm to Illumina. Dkt. No. 395.) |
| Ex. 12 - Excerpts from the May 25, 2021 deposition transcript of Dr. Joseph D. Puglisi | Portions of p. 6:20 | Illumina | **GRANTED** (Proposed redacted language concerns the home address of a third-party witness.  Dkt. No. 395.) |

## CONCLUSION

For the reasons explained above, Illumina's motion to strike portions of the Puglisi Report is GRANTED in part and DENIED in part.  Illumina's motion for summary judgment is GRANTED.

**IT IS SO ORDERED.**

Dated:  September 9, 2021



William H. Orrick
United States District Judge