David Bilsker (Bar No. 152383)
davidbilsker@quinnemanuel.com
David A. Perlson (Bar No. 209502)
davidperlson@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600 Tel.
(415) 875-6700 Fax

Andrew Bramhall (Bar No. 253115)
andrewbramhall@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
(650) 801-5000 Tel.
(650) 801-5100 Fax

Anne S. Toker (admitted *pro hac vice*)
annetoker@quinnemanuel.com
Robert B. Wilson (admitted *pro hac vice*)
robertwilson@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000 Tel.
(212) 849-7100 Fax

Derek L. Shaffer (admitted *pro hac vice*)
derekshaffer@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
(202) 538-8000 Tel.
(202) 538-8100 Fax

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ILLUMINA, INC. and ILLUMINA CAMBRIDGE LTD., <br><br> Plaintiffs, <br><br> v. <br><br> BGI GENOMICS CO., LTD., BGI AMERICAS CORP., MGI TECH CO., LTD., MGI AMERICAS INC., and COMPLETE GENOMICS INC., <br><br> Defendants. | Case Nos. 3:19-cv-03770-WHO <br>         3:20-cv-01465-WHO <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEY FEES AND ENHANCED DAMAGES** <br><br> Date:   March 2, 2022 <br> Time:   2:00 PM <br> Judge:  The Hon. William H. Orrick |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION.................................................................................................1

II.    LEGAL STANDARDS ........................................................................................2

III.   THIS CASE DOES NOT WARRANT AN AWARD OF ATTORNEYS' FEES ................2

       A.     The Court Should Grant JMOL of No Willful Infringement, but Even
              Absent JMOL, the Willfulness Finding Does Not Support Attorneys' Fees
              Here ........................................................................................................2

              1.     Illumina Cites No Evidence Tying Alleged Copying to Any Patent
                     Claims............................................................................................3

              2.     CGI Had a Good Faith Belief of Non-Infringement and/or Invalidity ..........6

              3.     CGI Planned to Commercialize Only its New CoolMPS Chemistry............8

       B.     CGI's Reasonable Litigation Positions and Discovery Conduct ...............9

              1.     CGI Advanced Strong, Often Winning Positions ...........................9

              2.     CGI's Assertion of the '984 Patent Was Squarely Grounded in the
                     Court's Claim Construction and Well-Established Legal Principles ..........10

              3.     CGI's Inequitable Conduct Allegations Were Reasonable ........................13

              4.     Illumina's Conduct, Not CGI's, Unreasonably Increased Discovery
                     Costs ............................................................................................16

IV.    THIS CASE DOES NOT WARRANT AN AWARD OF ENHANCED
       DAMAGES .........................................................................................................21

       A.     The Jury's Willfulness Finding Is Not a Basis for Enhanced Damages .................21

       B.     The *Read* Factors Weigh Against An Award of Enhanced Damages.....................22

V.     ILLUMINA'S MOTION IS PREMATURE ........................................................24

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>CASES</u>

*Biovail Labs., Inc. v. Anchen Pharm., Inc.*,
  233 F.R.D. 648 (C.D. Cal. 2006) ......................................................................... 18

*Bonita Boats, Inc. v. Thunder Craft Boats, Inc.*,
  489 U.S. 141 (1989) ............................................................................................... 5

*Detoy v. City & Cty. of San Francisco*,
  196 F.R.D. 362 (N.D. Cal. 2000) ........................................................................ 18

*Digital Reg of Tex., LLC v. Adobe Sys., Inc.*,z
  No. 12-cv-1971 CW, 2014 WL 4090550 (N.D. Cal. Aug. 19, 2014) ................................. 15

*Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*,
  946 F.3d 1367 (Fed. Cir. 2020) .......................................................................... 22

*Enplas Display Device Corp. v. Seoul Semiconductor Co.*,
  No. 13-cv-05038 NC, 2016 WL 482701 (N.D. Cal. Feb. 8, 2016) ..................................... 15

*Finjan, Inc. v. Sophos, Inc.*,
  244 F. Supp. 3d 1016 (N.D. Cal. 2017) .......................................................... 2, 22

*France Telecom S.A. v. Marvell Semiconductor Inc.*,
  No. 12-cv-04967-WHO, 2015 WL 4396201 (N.D. Cal. July 17, 2015) ............................... 2

*Gemtron Corp. v. Saint-Gobain Corp.*,
  572 F.3d 1371 (Fed. Cir. 2009) .......................................................................... 10

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
  579 U.S. 93 (2016) ................................................................................. 2, 21, 22, 23

*Humanscale Corp. v. Compx Int'l Inc.*,
  No. 09-cv-86, 2010 WL 3304261 (E.D. Va. Aug. 16, 2010) ........................................... 13

*In re PersonalWeb Techs., LLC Patent Litig.*,
  No. 18-md-02834-BLF, 2020 WL 5910080 (N.D. Cal. Oct. 6, 2020) ................................. 13

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996) ............................................................................................... 2

*Nuvo Pharm. (Ir.) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*,
  923 F.3d 1368 (Fed. Cir. 2019) .......................................................................... 15

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
  572 U.S. 545 (2014) ........................................................................................... 2, 9

*Ondersma v. Metro. Life Ins. Co.*,
  No. 06-cv-0258 MMC, 2007 WL 4371422 (N.D. Cal. Dec. 12, 2007) ............................... 24

*Oplus Techs., Ltd. v. Vizio, Inc.*,
   782 F.3d 1371 (Fed. Cir. 2015) ................................................................................. 12

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   No. 09-cv-05235-MMC, 2017 WL 130236 (N.D. Cal. Jan. 13, 2017) ........................ 22, 23

*Presidio Components, Inc. v. American Technical Ceramics Corp.*,
   875 F.3d 1369 (Fed. Cir. 2017) ................................................................................. 24

*Read Corp. v. Portec, Inc.*,
   970 F.2d 816 (Fed. Cir. 1992) ......................................................................... 2, 22, 23

*Rohm & Haas Co. v. Crystal Chem. Co.*,
   736 F.2d 688 (Fed. Cir. 1984) ................................................................................... 2

*SiOnyx LLC v. Hamamatsu Photonics K.K.*,
   981 F.3d 1339 (Fed. Cir. 2020) ................................................................................. 3

*Stragent, LLC v. Intel Corp.*,
   No. 11-cv-421, 2014 WL 6756304 (E.D. Tex. Aug. 6, 2014) ...................................... 13

*Therasense, Inc. v. Becton, Dickinson & Co.*,
   649 F.3d 1276 (Fed. Cir. 2011) ................................................................................. 15

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*
   532 U.S. 23 (2001) ................................................................................................... 5

*Use Techno Corp. v. Kenko USA, Inc.*,
   No. 06-cv-02754 EDL, 2007 WL 3045996 (N.D. Cal. Oct. 18, 2007) .......................... 24

*Verinata Health, Inc. v. Sequenom, Inc.*,
   No. 12-cv-00865-SI, 2014 WL 4100638 (N.D. Cal. Aug. 20, 2014) .............................. 11

*VirnetX Inc. v. Apple Inc.*,
   No. 12-cv-00855-RWS, 2018 WL 10048706 (E.D. Tex. Aug. 30, 2018) ...................... 22

*WBIP, LLC v. Kohler Co.*,
   829 F.3d 1317 (Fed. Cir. 2016) ................................................................................. 2

**RULES**

Civil L.R. 54-5 ............................................................................................................. 24

Fed. R. Civ .P. 54(d)(2)(B)............................................................................................. 24

# I.     **INTRODUCTION**

This was a close, hard-fought, case between competitors with a split verdict after five days of jury deliberation. Between summary judgment and trial, CGI succeeded on two of the three patents that were asserted against CoolMPS, the only product relevant to the intended U.S. commercial launch. CGI had every right to defend itself, as the patent system contemplates. When Illumina's rhetoric is put to the side, the facts show that CGI acted reasonably and responsibly, and that there is no basis for punitive awards of enhanced damages or attorneys' fees.

Illumina resorts to its familiar emphasis on its purportedly "battle-hardened" patent rights which it believes should have compelled CGI to immediately to throw in the towel rather than mount a defense. Those previous "battles," however, concerned ***only*** the '537 patent—a patent that Illumina did not even assert against CoolMPS and one that the evidence showed is actually invalid.[1] That the '537 patent withstood previous challenges did not preclude CGI from mounting its own defense as to it and says nothing about the validity of the other asserted patents. Indeed, the jury found the 'claim 3 of the '444 patent and claim 1 of the '025 patent invalid.[2] If anything, as noted throughout CGI's post-trial briefing, it is ***Illumina*** that has repeatedly misrepresented the history regarding the patents at issue to create the false impression that all the patents are somehow "battle-hardened."

Illumina also prominently complains of CGI's litigation conduct. Illumina points out that CGI did not prevail on all of its claims and defenses. That does not make their assertion misconduct. If it did, then Illumina's conduct would be a basis for finding fees should be awarded to CGI for Illumina's several losses too. Nothing about CGI's behavior is the type of exceptional or egregious behavior necessary to justify attorneys' fees or enhanced damages. Illumina's Motion should be denied.

---

[1] *See* Dkt. 597 (CGI's Response to JMOL) at 19 (referencing Dr. Romesberg's testimony showing the '537 patent could not be valid as it claims an impossibility, nucleosides being incorporated by polymerases).
[2] The Court ruled that CoolMPS did not infringe any claim of the '025 patent.

## II.     LEGAL STANDARDS

A district court may award attorneys' fees if the case is "exceptional." 35 U.S.C. § 285. An exceptional case must be "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 572 U.S. 545, 554 (2014). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* Attorneys' fee awards are "not to be regarded as a penalty for failure to win a patent infringement suit." *Rohm & Haas Co. v. Crystal Chem. Co.*, 736 F.2d 688, 691 (Fed. Cir. 1984) (citation omitted). Nor should they be a penalty for good faith zealous advocacy. *See France Telecom S.A. v. Marvell Semiconductor Inc.*, No. 12-cv-04967-WHO, 2015 WL 4396201, at *4 (N.D. Cal. July 17, 2015) (denying motion for attorney's fees and holding that "good faith zealous advocacy . . . [is] not exceptional"); *see also Finjan, Inc. v. Sophos, Inc.*, 244 F. Supp. 3d 1016, 1029 (N.D. Cal. 2017).

An award of enhanced damages is "designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior" and is reserved for cases in which the defendant's conduct is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103-04 (2016). In assessing enhanced damages, courts may consider the nine factors described in *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992), *abrogated in part on other grounds by Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). "Knowledge of the patent alleged to be willfully infringed continues to be a prerequisite to enhanced damages." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016) (citing *Halo*, 579 U.S. at 104-05).

## III.     THIS CASE DOES NOT WARRANT AN AWARD OF ATTORNEYS' FEES

### A.     The Court Should Grant JMOL of No Willful Infringement, but Even Absent JMOL, the Willfulness Finding Does Not Support Attorneys' Fees Here

Illumina's arguments concerning purported knowledge of Illumina's "patents" and willfulness suffer the same flaws as their trial presentation concerning willfulness: Illumina

repeatedly refers to "Illumina's azido technology" and "Illumina's patents" without identifying any particular patent or claim. As discussed in CGI's renewed motion for judgment as a matter of law concerning willfulness (Dkt. 580[3] "CGI's JMOL"), by the time CGI knew of the '537 patent, it was no longer doing research in the U.S. on that product as it was already commercially launched in other countries. Rather, it was working on CoolMPS, and Illumina has never claimed CoolMPS infringes the '537 patent. Not until this litigation began, did Illumina ever identify the patents that CoolMPS allegedly infringed. For those reasons, CGI is entitled to JMOL of no willfulness, and willfulness thus cannot support Illumina's request for attorneys' fees.

Even if the willfulness verdict were to stand, however, a finding of willfulness does not mandate an award of attorneys' fees, especially here given the closeness of the case. *SiOnyx LLC v. Hamamatsu Photonics K.K.*, 981 F.3d 1339, 1355 (Fed. Cir. 2020) (observing attorney fee award not mandatory when willful infringement found).

The following discussion of copying and CGI's knowledge—pointing out the flaws in Illumina's arguments—is equally applicable to the factors to be reviewed in assessing enhanced damages, *i.e.*, *Read* Factors Nos. 1 (copying) and 2 (knowledge and good faith belief).

                1.        <u>Illumina Cites No Evidence Tying Alleged Copying to Any Patent Claims</u>

CGI's JMOL demonstrated that Illumina failed to prove that CGI copied any Illumina technology, let alone any patented technology. Dkt. 580 at 16. Instead, Illumina lumps together "Illumina's technology" and "Illumina's patent rights" generally, without attempting to connect the subject matter of any claim on which it prevailed to any alleged copying. Dkt. 575-4 at 5-6.

Although Illumina points to a 2008 publication as evidence that CGI "knew of Illumina's technology," Dkt. 575-4 at 5, Illumina fails to connect the "Illumina technology" of that 2008 article with the Asserted Patents, none of which issued before 2009. *Id.* Illumina also exaggerates that after BGI acquired CGI, BGI "promptly" changed to Illumina's chemistry, *id.*, where the cited testimony establishes that the change was made more than two years after the 2013 acquisition. Tr. 355:10-18 (noting that CGI's Revolocity product "was canceled or was put on hold in late 2015

---

[3]  Case No. 3:19-cv-03770. "CGI II" refers to Case No. 3:20-cv-01465.

for business reasons"). Moreover, none of the cited evidence identifies any particular aspect of the "azido technology" or any specific patent that was supposedly copied. Dkt. 575-4 at 5 (citing TX0393; Tr. 325:16-326:17; Tr. 740:23-741:11).

Illumina misstates both the scope of the asserted patents and CGI's knowledge of them. Dkt. 575-4 at 5-6. For example, Illumina relies on knowledge of QIAGEN's "failed attempts to challenge Illumina's azidomethyl patents," using the plural "patents," when only the single '537 patent was at issue. *See* Dkt. 575-4 at 5; TX1803; TX0575; Dkt. 580 at 15.

Illumina also argues that "[d]espite its knowledge of Illumina's **patents**, BGI engaged in a years-long effort to copy Illumina's SBS technology," and that "BGI did not stop at copying **Illumina's blocking group**." *See* Dkt. 575-4 at 6 (emphasis added). As set out in CGI's JMOL and its motion for a new trial, the evidence showed only that CGI was aware of the '537 patent, not the other asserted patents, before the litigation. Dkt. 581 at 8; Dkt. 580 at 15. Moreover, the asserted patents do not cover an azidomethyl blocked nucleotide on its own, as Illumina alleges, because the jury invalidated the '444 patent, which had that scope. Dkt. 581 at 11.

As also set out in CGI's JMOL, Illumina's evidence of "copying" does not show copying of Illumina's technology, let alone the required copying tied to any specific asserted patent. Dkt. 580 at 16-17. Illumina mischaracterizes the phrase "XY team," Dkt. 575-4 at 6, which referred to the development team using Illumina instruments to check the aspects of chemistry developed by Defendants, in contrast to the "BB" team, which used Blackbird instruments. Tr. 313:24-314:6. Illumina also mischaracterizes the phrase "mimic XY," Dkt. 575-4 at 6, which referred to "mimicking" the Illumina dyes only, so that the dyes used in evaluating chemistry were selected so they could be evaluated using the Illumina machine, which is only set to identify certain dyes. Tr. 350:7-22. Particular dyes are irrelevant to the asserted patent claims. Tr. 494:12-25; 350:4-351:3; Dkt. 580 at 17. In addition, the evidence that Illumina relies on to support its statement that CGI "hired a third-party to determine the structure of Illumina's nucleotides," Dkt. 575-4 at 6, instead shows that CGI "analyzed" nucleotides CGI received from Acme Biosciences, not Illumina's nucleotides. Tr. 312:1-9. Notably, Illumina's expert testified that, based on his analysis, when CGI synthesized its own azidomethyl blocked nucleotides, it used Zavgorodny's prior art

synthesis methodology. Tr. 671:12-18. Therefore, the testimony that Illumina cites, that the structure for the 3'-*O* azidomethyl structures in the accused products is the same as Illumina's, does not demonstrate copying. Tr. 278:6-9.

Illumina further argues that CGI "analyzed and copied" Illumina's polymerase, sequencing algorithm, and linker. Dkt. 575-4 at 6. Yet, Illumina pointed to no evidence that CGI "copied" Illumina's polymerase, nor is there any. The testimony Illumina cited does not refer to a polymerase at all. Tr. 316:22-24. Illumina also pointed to no evidence that Defendants "analyzed," let alone "copied," Illumina's "sequencing algorithm." Dkt. 575-4 at 6. The evidence showed, on the contrary, that CGI never had access to Illumina's "sequencing algorithm." Tr. 342:24-344:20. Similarly, Illumina points to the testimony of its expert, Dr. Romesberg, comparing the linker in the accused StandardMPS products with a linker that Illumina published in *Nature* in 2008. Dkt. 575-4 at 6 (citing Tr. 650:5-13). However, this testimony does not show that CGI copied Illumina's linker. Illumina admitted that cleavable linkers, such as those used in the StandardMPS product which CGI never launched, are well known in the art. TX-413.5; TX-715.17; TX-715.24 ("[Illumina] does not . . . dispute Petitioner's contention that it would have been obvious to use Church's disulfide linker in Dower's methods."); TX-986.17; TX-986.24; TX-1783.9; TX-1803.19. Even Illumina's expert Dr. Romesberg testified that the use of such cleavable linkers was conventional before Illumina filed its patents. Tr. 1063:3-7. In any event, none of the asserted patent claims cover a particular "polymerase," a "sequencing algorithm," or a particular "linker" so even if those had been copied, such copying could not be a basis for attorneys' fees or enhanced damages. On the contrary, the Supreme Court has recognized that "[a]llowing competitors to copy will have salutary effects in many instances, " as "[r]everse engineering of chemical and mechanical articles in the public domain often leads to significant advances in technology." *TrafFix Devices, Inc. v. Marketing Displays, Inc.* 532 U.S. 23, 29 (2001) (quoting *Bonita Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 160 (1989)). Patent law is thus designed to protect the public's right to copy as much as to protect the patentee's limited monopoly. *Bonita Boats*, 489 U.S. at 150-51.

1    Illumina's argument that its expert, Dr. Romesberg, "explained BGI's copying project,"

2    Dkt. 575-4 at 6, is misleading. In response to the question from Illumina's counsel, "Have you

3    seen evidence that BGI copied ***Illumina's patented azido chemistry***?," Tr. 646:13-15 (emphasis

4    added), Dr. Romesberg testified that Defendants had copied Illumina's "patented azido

5    chemistry," arguing that Defendants were aware of Illumina's 2008 *Nature* paper and that

6    Defendants analyzed Illumina's nucleotides. Tr. 646:13-650:18. However, Dr. Romesberg

7    admitted on cross examination that, based on his analysis, when CGI synthesized its own

8    azidomethyl blocked nucleotides, it used Zavgorodny's prior art synthesis methodology. Tr.

9    671:12-18. Illumina again misrepresents the evidence regarding the phrase "developed from XY."

10   The evidence showed that this statement referred to development of Zebra by CGI's team that

11   previously worked with Illumina instruments, not to copying of those instruments. Dkt. 580 at 16.

12              2.    CGI Had a Good Faith Belief of Non-Infringement and/or Invalidity

13   CGI's good faith belief supports both denying that this case is exceptional and declining to

14   enhance damages, i.e., *Read* Factor No. 2. Illumina's argument regarding CGI's belief improperly

15   combines the five asserted patents and the two accused technologies without acknowledging

16   differences in claim scope or difference between the technologies. For example, Illumina argues

17   that that CGI "never really had a meaningful non-infringement argument," Dkt. 575-4 at 6, despite

18   the fact that Illumina never even asserted that CoolMPS infringes either of the '537 or '200

19   patents, and that the Court granted summary judgment that CGI's CoolMPS chemistry does not

20   infringe the '025 patent. Further, Dr. Rade Drmanac testified at trial that it was clear to him that

21   the '537, '200, and '025 patents all did not apply to CoolMPS because they all required having a

22   label on the nucleotide. Tr. at 597:21-598:17.

23   Illumina asserts that CGI's "corporate representative on the topic of willfulness" was MGI

24   President Duncan Yu, and then relies on Mr. Yu's testimony. Dkt. 575-4 at 6-7. Mr. Yu was not,

25   however, CGI's "corporate representative on the topic of willfulness."[4] To the contrary, Mr. Yu

26   was designated to testify concerning Illumina's 30(b)(6) Topic Nos. 5 and 6, which concerned the

27   _____

28   [4] Illumina made that same misrepresentation to the jury. Tr. 1188:22-1189:7.

decision to launch and the announcement of products in the United States. Dkt. 316 at 1; Ex. 6 at 4. Illumina had a separate topic concerning facts related to willfulness, for which Mr. Yu was not designated. Ex. 6 at 9 (Topic 49). To the extent that Mr. Yu or any other CGI witness "acknowledged" QIAGEN's failed challenge to "Illumina's azido patent" or the implications of CGI's own 2018 IPR, that acknowledgement was limited to the '537 patent. Further, by the time of the decision on QIAGEN's challenge to the '537 patent, research in the U.S. had moved to CoolMPS, a technology that even Illumina recognizes does not infringe the '537 patent. Tr. 463:6-9, 571:6-590:15, 595:9-13, 614:5-10.

Illumina repeats its error of lumping all of its patents together in its discussion of Dr. Drmanac's testimony concerning his view of invalidity of the '537 patent. Illumina casts aspersions, asserting that Dr. Drmanac's opinion concerning the '537 patent was "unsubstantiated and reckless." Dkt. 575-4 at 7. CGI disagrees. In any event, however, Illumina's argument, which concerns Dr. Drmanac's opinions about the '537 patent, is irrelevant to CGI's decision to launch CoolMPS.

Illumina also misleadingly argues that Dr. Drmanac's "opinions about the invalidity of the *asserted Patents* were all reflected in BGI's Petitions to the PTAB." Dkt. 575-4 at 7 (emphasis added) (citing Tr. 479:13-481:3). In the cited questioning, Illumina's counsel was admonished to be clear about not lumping Illumina's patents together. Tr. at 479:13-480:5. After that warning, Illumina's counsel asked "And the IPR reflects your personal views on the question of the validity of Illumina's patented rights *that were at issue in that matter*?" Tr. 480:25-481:2 (emphasis added). Dr. Drmanac replied "Yes." Tr. 481:3. Only the '537 patent was at issue in the IPR. TX0984; TX0985. Illumina's suggestion that Dr. Drmanac's views about invalidity of the other Asserted Patents were also contained in the '537 IPR is particularly misleading in light of Dr. Drmanac's deposition testimony, where, when he was asked about "other invalidity opinions that you personally hold other than those that are in the IPRs that relate to any of the Illumina patents in these cases," he testified concerning his opinions that both the '973 and '444 patents are invalid. Ex. 1 (R. Drmanac Dep.) at 120:9-122:14; *see also* Tr. 117:18-118:5.

1   Illumina can point to no decisions undercutting CGI's beliefs about the other Asserted

2   Patents. And, as this case has shown, not only did CGI have good faith beliefs that no valid claim

3   covered CoolMPS, but it won on the majority of those arguments.

4           3.        <u>CGI Planned to Commercialize Only its New CoolMPS Chemistry</u>

5   Illumina's argument as to copying and good faith belief is also fatally flawed because

6   CGI's proposed U.S. launch would have been limited to its new CoolMPS Chemistry, TX1129;

7   Dkt. 119-4 at 1, which does not infringe the '537 patent.

8   As discussed above and in CGI's JMOL, the QIAGEN IPR and injunction concerned the

9   '537 patent. Dkt. 580 at 15. CGI's challenges to Illumina's patents likewise concerned the '537

10   patent. Dkt. 575-4 at 8; TX0984; TX0985. As Dr. Drmanac testified at trial, it was clear to CGI

11   that CoolMPS did not infringe the '537 patent. Tr. at 597:21-598:6. Further, the exhibits that

12   Illumina cites concerning purported acknowledgment that CGI could not enter the market "with

13   their sequencing products," Dkt. 575-4 at 8, did not concern the proposed 2020 launch of

14   CoolMPS. *See* TX0321 (October 9, 2018 Powerpoint); TX0322 (April 2019 email); TX0323

15   (April 2018 email chain); TX702 (October 2018 email chain).

16   Illumina has never asserted that CoolMPS infringes the '537 patent. Neither has it asserted

17   that CoolMPS infringes the '200 patent. With respect to the three patents asserted against

18   CoolMPS, Illumina offered no evidence that CGI had pre-suit knowledge of those patents, but

19   regardless, the Court granted summary judgment that CoolMPS does not infringe the '025 patent,

20   CGI II Dkt. 469, and the jury found the '444 patent invalid as obvious, Dkt. 550 at 8, leaving only

21   the '973 patent. Until claim construction, CGI had a reasonable belief that CoolMPS does not

22   infringe the '973 patent. CGI II Dkt. 191 at 13-23; CGI II Dkt. 95-2 at 3-5. Further, the '973

23   patent suffers from similar issues of invalidity as the '444 patent and is the subject of CGI's

24   JMOL. Dkt. 580 at 1-10. Illumina's decision not to assert the '537 or '200 patents against

25   CoolMPS, this Court's grant of summary judgment of non-infringement of the '025 patent by

26   CoolMPS, and the jury's verdict invalidating the '444 patent all confirm the reasonableness of

27   CGI's decision to try to launch CoolMPS. Illumina's resort to inflammatory language such as

28   claiming that CGI was engaging in "blatantly infringing commercial activities in the U.S. despite

widespread acknowledgment of Illumina's Patents rights," Dkt. 575-4 at 9, is not a substitute for evidence.

**B.    CGI's Reasonable Litigation Positions and Discovery Conduct**

The closeness of the case and the reasonableness of CGI's' litigation positions—especially compared to Illumina's conduct—demonstrate that this is not an "exceptional" case for purposes of Section 285. These same facts show that enhanced damages are not warranted under Section 284, specifically *Read* Factors Nos. 3 (closeness of case) and 5 (litigation conduct).

1.    <u>CGI Advanced Strong, Often Winning Positions</u>

CGI prevailed in many instances in this case, undercutting Illumina's argument that this case was exceptional or that Illumina is entitled to enhanced damages. Indeed, CGI prevailed in obtaining summary judgment of non-infringement with respect to its CoolMPS product and the '025 patent. Dkt. 575-4 at 9. Likewise, Illumina argues that CGI's invalidity contentions were unreasonable. But of course the jury spent five days deliberating and found that claim 3 of the '444 patent and claim 1 of the '025 patent were invalid.  Dkt 550.

Illumina attempts to look only at issues it won and not that it lost as support for its claim that these "wins" entitle it to attorneys' fees. However, the Court's determination of whether the case is "exceptional" must be based on the "totality of the circumstances" and not consideration of only the points on which Illumina won, in isolation. *Octane,* 572 U.S. at 554.

Finally, Illumina reiterates the now-familiar canard that CGI's obviousness arguments had been "previously rejected in multiple forums by ten different judges." Dkt. 575-4 at 10. That is inaccurate. First, as detailed in CGI's JMOL for invalidity, no tribunal ever heard the evidence that the Staudinger reaction that Zavgorodny taught was commonly known to undergraduate chemistry students and that a person of ordinary skill would know to use aqueous phosphines in that reaction to remove the azidomethyl for sequencing reactions. Nor had any tribunal ever addressed the combination of Zavgorodny and Parce, the latter of which identifies TCEP as a phosphine to use in sequencing, has no efficiency requirement and merely required two rounds of SBS to be

1  performed, with no particular time limit, as is the case for all of Illumina's patents.[5] Second, to the

2  extent there was overlap between prior decisions and what was presented at trial, CGI presented

3  unrebutted testimony showing how prior decisions relied on incorrect scientific assumptions.

4  Moreover, no tribunal had ever considered the written description argument on the '973 patent; in

5  fact, no tribunal had ever addressed the '973 patent. Illumina lump together all of its "azido"

6  patents, and to argue that all of them overcame multiple obviousness challenges in prior

7  proceedings. And as the jury verdict of obviousness with respect to '444 claim 3 and '025 claim 1

8  confirms, each of the asserted patents has different claims that must be considered separately.

9          2.   CGI's Assertion of the '984 Patent Was Squarely Grounded in the Court's
            Claim Construction and Well-Established Legal Principles

10

11        Illumina's characterization of the '984 patent is incorrect. CGI's infringement contentions

12  were premised on well-established principles of patent law—in particular, that intermediate

13  structures, as well as final products, may infringe composition of matter claims, such as the claims

14  to "high density DNA arrays" asserted in this case. As the Federal Circuit has made clear,

15  infringement by an intermediate is still infringement, and liability is the same. *Gemtron Corp. v.*

16  *Saint-Gobain Corp.*, 572 F.3d 1371, 1379-81 (Fed. Cir. 2009). Likewise, CGI followed every

17  aspect of the Court's construction in its contentions—including the requirement that "more than

18  50% of the DNA binding regions in the array have multiple copies of one single DNA." Dkt. 190

19  at 16-21. Nothing in CGI's infringement contentions or the Court's summary judgment ruling

20  satisfies the heightened standard for an exceptional case required for an award of attorney's fees.

21        As an initial matter, Illumina errs suggesting the Court's claim construction was a foregone

22  conclusion. Dkt. 575-4 at 11. To the contrary, the Court specifically noted that the construction of

23  whether the "more than 50%" element in the asserted claims should be limited to a single

24  molecule per DNA binding site involved a particularly "close question." Dkt. 190 at 21

25  ("Although this is another close question, I find that the specification and claim language support

26  Illumina's construction to limit the binding regions to one DNA macromolecule."). As the Court

27  ─────────────
[5]  Prior tribunals imposed an efficiency requirement that was not present in the claims or at trial.
28  Tr. 581:18-584:14; TX984-63 through -64.

explained, "[t]he use of one macromolecule per DNA binding region is certainly a preferred embodiment." *Id*. at 19.  However, "[i]t is less clear whether it is a critical aspect of the invention that limits the claim term," and as such, this presented a "closer" question.  *Id*. Resolution of this sharply disputed and "close" claim construction issue in Illumina's favor does not rise to the level of an exceptional case.

Next, Illumina argues it was not on notice regarding CGI's contentions with respect to the intermediate DNAs formed on the accused flowcells during cluster generation. Dkt. 575-4 at 11. But it was Illumina that caused delay. As this Court explained: "[i]f Illumina suffered any confusion concerning what infringement contentions were being asserted, then 'the proper recourse' would have been for Illumina to compel CGI to amend its infringement contentions, not to wait until after expert discovery to move to strike the Puglisi Report." Dkt. 424 at 12 (quoting *Verinata Health, Inc. v. Sequenom, Inc*., No. 12-cv-00865-SI, 2014 WL 4100638, at *6 (N.D. Cal. Aug. 20, 2014)). Instead, as the Court found, Illumina "waited a full year after the close of fact discovery and a few weeks after the close of expert discovery to file its motion to strike, burying its head in the sand until it was safe to raise the issue of the Double-Stranded DNA and Pass Filter theories with the court." *Id*. at 13.

Finally, Illumina argues that it was "scientifically inaccurate" for CGI to contend that the complementary copies of DNA formed during cluster generation are multiple copies of the same DNA that satisfy the "more than 50%" element of the '984 claims. Dkt. 575-4 at 11-12. But that is exactly how Illumina itself described these intermediate DNAs in its instructional videos. Specifically, Illumina's video describes how a polymerase creates a complement of the first DNA template that binds to the surface of the nanowell, and refers to the first double stranded template that is formed on the surface of the flowcell as a "double stranded molecule." Dkt. 388-12 (CGI000011966, Introduction to Sequencing by Synthesis video) at 1:19-1:25. Illumina then describes how the template DNA is copied in the first round of bridge amplification, "resulting in two single stranded copies" of the original DNA, consistent with the Court's construction and CGI's infringement contentions. *Id*. at 1:40-1:53 ("Polymerases generate the complementary strand, forming a double stranded bridge. This bridge is denatured, resulting in ***two single***

*stranded copies* of the molecule that are tethered to the flow cell." (emphasis added)). Illumina does not explain why it characterizes complementary DNA sequences as "two single stranded copies" to prospective customers if it was "scientifically inaccurate" to do so. Indeed, the whole point of the amplification process is to generate multiple copies of a single target DNA in each well of the accused flowcells, as Illumina repeatedly acknowledges. *See* Dkt. 388-6 (CGI000011965, Patterned Flow Cell Technology video) at 0:55-1:35; Dkt. 388-9 (CGI000011963, NovaSeq System Explorer video) at 0:55-1:07; Dkt. 388-12 (CGI000011966, Introduction to Sequencing by Synthesis video) at 0:30-47; Dkt. 388-10 (ILMNBGI_NDCAL0010605, Technical Spotlight: Sequencing – Patterned Flow Cell Technology) at 1, Exclusion Amplification; Dkt. 388-11 (CGI000011950, Technical Note: Patterned Flow Cell Technology) at 2, Exclusion Amplification Chemistry.

Illumina is wrong to say that CGI's expert "did not stand by" his opinions regarding complementary copies of DNA. Dkt. 575-4 at 12. Dr. Puglisi explained that a person of ordinary skill would understand that a double stranded DNA molecule includes two complementary copies of a single DNA sequence, and that the element in the asserted claims referring to "multiple copies of one single DNA" encompasses such complementary copies. Ex. 2 (Puglisi Dep. Tr.) at 11:21-23 ("Q. So in your view, strand 1 is a copy of strand 2; correct? A. Yes."); *see also id.* at 11:12-12:4, 158:13-160:10, 163:8-20, 192:12-193:12, 199:22-200:20.

The Court's summary judgment ruling on infringement of the '984 patent does not entitle Illumina to attorney's fees and expenses. Even that ruling was close. The Court's tentative ruling found that summary judgment would not be granted on infringement under the doctrine of equivalents. Dkt. 406 at 1. If the issues were so straightforward, Illumina would not have had to reverse the tentative ruling to have succeeded. In any event, an award of fees is an extreme remedy, reserved for only the most egregious cases.[6] Under Illumina's theory, however, it is

---

[6] The cases that Illumina cites are inapposite. *Oplus Techs., Ltd. v. Vizio, Inc.*, 782 F.3d 1371 (Fed. Cir. 2015) involved an "egregious pattern of misconduct" that is not present here—including delaying the litigation by strategically amending claims to manufacture venue, misusing the discovery process to harass the defendant, blatantly misinterpreting prior discovery requests in an (footnote continued)

1    entitled to attorney's fees based on an ordinary grant of summary judgment. That is not the rule.

2    Otherwise, CGI would also be entitled to attorney's fees and expenses to defend against Illumina's

3    claim of infringement for the '025 patent directed to CGI's CoolMPS sequencing system—which

4    was likewise resolved on summary judgment. This case falls far short of the standard for an

5    exceptional case where fees may be warranted.

6                    3.    CGI's Inequitable Conduct Allegations Were Reasonable

7             CGI was entitled to mount a defense of inequitable conduct even if it did not prevail. As

8    Judge Dyk has warned, applying "[t]he totality of the circumstances standard is not, however, an

9    invitation to a 'kitchen sink' approach where the prevailing party questions each argument and

10   action of the losing party in an effort to secure attorney's fees." *Stragent, LLC v. Intel Corp.*, No.

11   11-cv-421, 2014 WL 6756304, at *3 (E.D. Tex. Aug. 6, 2014). Losing a defense is not evidence of

12   unreasonable conduct. *See Humanscale Corp. v. Compx Int'l Inc.*, No. 09-cv-86, 2010 WL

13   3304261, at *7 (E.D. Va. Aug. 16, 2010) (refusing to award fees even though defenses were

14   dismissed for lack of proof). Indeed, as this Court recognized, "rigorous advocacy would require

15   [the party's] legal team to advance all plausible arguments before the tribunals and opposing

16   counsel to attack those arguments." Dkt. 81 at 8.

17            CGI's initial inequitable conduct allegations also do not show any unreasonable litigation

18   conduct. *See id.* The Court noted that the pleading standard for inequitable conduct is high given

19   the specific intent requirement. *See id.* at 3. That the Court found that CGI did not meet this high

20   pleading standard does not show unreasonableness. In addition, this defense was dismissed early

21

22   _____

23   attempt to obtain the same information the Court had previously refused to compel, and using
     improper litigation tactics including presenting contradictory expert evidence and infringement

24   contentions, as well as misrepresenting legal and factual support. *Id.* at 1372-75.

25   Similarly, *In re PersonalWeb Techs., LLC Patent Litig.*, No. 18-md-02834-BLF, 2020 WL
     5910080 (N.D. Cal. Oct. 6, 2020) involved a course of conduct throughout the litigation that is

26   completely different from the situation here—including infringement claims that were precluded
     by summary judgment in an earlier case, inconsistent allegations as to the identity of the products

27   accused of infringement, disregard for the Court's construction of certain claim terms in favor of
     its own "preferred" construction, inconsistent representations regarding the characterization of

28   (footnote continued)

in the case, as Illumina filed its motion to dismiss this affirmative defense (among other claims and defenses, one of which the Court did not dismiss) five weeks after CGI answered Illumina's First Amended Complaint. *See* Dkts. 54, 65. Illumina presents no evidence that any of this conduct "[drove] up the cost and complexity" of this litigation. Dkt. 575-4 at 13.

Illumina next points to CGI's inequitable conduct defense that Illumina failed to disclose the Kovacs reference. *Id.* at 13-14. CGI's prosecution of this defense was reasonable. Indeed, the Court agreed that CGI's defense was not futile, noting that the allegations of inequitable conduct were "sufficient to support a plausible inference that Drs. Liu and Wu had knowledge of the Kovacs publication" and that they supported a plausible inference of specific intent to deceive. CGI II Dkt. 263 at 7-8. Moreover, CGI did not "shift its focus" to a defense based on Dr. Lee, Dkt. 575-4 at 14—Dr. Lee was part of CGI's allegations from the start, as the citation to Kovacs appeared in her laboratory notebook. *See, e.g.*, CGI II Dkt. 226-4 at 52-56.

Finally, Illumina's suggestion that CGI should simply accept Illumina's interpretation of the evidence because of identical self-serving declarations from two of the eight inventors concerning Kovacs is unsupportable. CGI uncovered evidence that the Drs. Lee, Liu, and Wu were all working together on the same process and passed compound among one another. *See, e.g.*, CGI II Dkts. 421-22, 421-24, 421-26. The testimony also showed that the Illumina chemistry group was very small (six people) and that they worked closely together, talking together about their work informally and meeting twice a week to review what the group was working on. CGI II Dkt. 572-4 at 28:3-29:23, 172:23-173:23, 224:5-19. In fact, Dr. Brennan, one of the inventors and a member of the six-person chemistry group, testified that it was ***not reasonable*** to think that "one person in the group that was working on the same thing as other people would have known where a particular synthesis had originated and the others wouldn't know." *Id.* at 224:5-19. While the Court held otherwise on summary judgment, this testimony directly supported CGI's defense that, because Dr. Lee took the method of adding phosphates onto the 3'-*O* azidomethyl blocked

consumer cases involved in multi-district litigation, and declarations submitted to the Court that the patentee "should have known were not accurate."  *Id.* at *20, *12.

1   nucleosides from the Kovacs reference (as shown in her laboratory notebook), the other members

2   of her team, including Drs. Li and Wu, who literally worked shoulder to shoulder with her in the

3   lab and on the same process of adding phosphates to the 3'-*O* azidomethyl blocked nucleosides,

4   would have been aware of the source of that method. Although the Court ultimately held that

5   CGI's inequitable conduct defense did not meet the stringent requirements of *Therasense, Inc. v.*

6   *Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc), it did not find, as Illumina

7   claims, that the Kovacs reference was not material. *See* CGI II Dkt. 471 at 22. Instead, the Court

8   focused on the specific intent element. *Id.* at 24. CGI's inability to clear the "single most

9   reasonable" standard does not show that asserting this defense was unreasonable, especially given

10  the evidence uncovered during discovery. CGI was entitled to litigate the issue and seek to rely on

11  court decisions coming to the opposite conclusion. *Enplas Display Device Corp. v. Seoul*

12  *Semiconductor Co.*, No. 13-cv-05038 NC, 2016 WL 482701, at *3-4 (N.D. Cal. Feb. 8, 2016)

13  (denying summary judgment).

14      Illumina next criticized CGI's deposition of two of its witnesses, Drs. Liu and Reudiger

15  but cites no authority that continuing to question witnesses who avoid answering the question

16  constitutes litigation misconduct. Dkt. 575-4 at 15.[7]

17      Last, CGI's designation of inventor testimony relevant to obviousness does not constitute

18  misconduct. CGI designated testimony from the inventors relevant to prior art and written

19  description, which is relevant. *Digital Reg of Tex., LLC v. Adobe Sys., Inc.*, No. 12-cv-1971 CW,

20  2014 WL 4090550, at *8 (N.D. Cal. Aug. 19, 2014) (inventor testimony relevant to invalidity);

21  *Nuvo Pharm. (Ir.) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*, 923 F.3d 1368, 1381 (Fed.

22  Cir. 2019) (inventor testimony "illuminates the absence of critical description in this case"). CGI

23  complied with the Court's order and did not designate testimony solely related to inequitable

24  conduct. But because CGI's inequitable conduct defense was still in the case when these

25  depositions were taken, there was overlap in some testimony. CGI further narrowed the testimony

26

27  [7]  Illumina resorted to repeating questions and calling Defendants' witnesses liars when they did

28  not get the answer they wanted. *See* Ex. 3 (H. Li Dep. Tr.) at 96:9-99:4.

as part of its trial preparation, and the Court admitted some of the designated testimony to which Illumina objected as retracing the path of the invention. This conventional trial preparation is not misconduct.

4. Illumina's Conduct, Not CGI's, Unreasonably Increased Discovery Costs

The history of discovery disputes in this case demonstrates that it was Illumina that was incalcitrant, not CGI. Illumina took more than twenty fact deposition of CGI witnesses. CGI produced more than 750,000 documents, totaling more than 3.5 million pages. And CGI served extensive privilege logs. CGI's primary privilege log for documents dated prior to the ligation consisted of more than 3,000 entries for documents spanning 13 years. Considering the extensive discovery, it is little surprise that CGI pushed back on certain of Illumina's demands, particularly where those demands implicated materials protect from discovery by the work product doctrine or attorney-client privileged. The fact that Illumina prevailed in some of the parties' discovery disputes does not render CGI's behavior unreasonable.

Illumina's one-sided summary of discovery also ignores Illumina's discovery conduct that resulted in unnecessary motion practice and increased cost. For example, early in discovery, Illumina resisted producing most of the named inventors for deposition and forced CGI to move to compel those depositions. CGI II Dkt. 144. In its opposition, Illumina argued that the inventor depositions were not necessary, and that even if they were, CGI should be forced to seek the depositions of foreign witnesses through the procedures of the Hague Convention. *Id.* at 4. Illumina at one point said four inventors were available and then when CGI said it would move on the rest, Illumina made two of those four unavailable. *Id.* at 2. The Court ultimately disagreed with Illumina's tactics and position, and ordered Illumina "to make the inventors available for deposition by videoconference or face sanctions." CGI II Dkt 164 at 8. The Court also stated that it had "some concerns that Plaintiffs may have been priming the inventors to refuse to attend depositions," and recited various statements that sparked those concerns. *Id.* at 8-9. The Court summarized that "it may be that Plaintiffs' efforts to compel the inventors to make themselves available for deposition have consisted of meekly asking them to volunteer to travel great distances and imperil their lives. If Plaintiffs cannot make any of the inventors available for

deposition by videoconference, they may face sanctions." *Id.* at 9. Not surprisingly, after these strong admonitions from the Court, Illumina was able to make the inventors available for deposition. Illumina provides no explanation for this in its Motion.

Illumina also forced unnecessary discovery motion practice concerning discovery from third-party supplier MyChem, despite the fact that the same information could be obtained from CGI. Dkt. 299-4. To avoid motion practice, CGI offered to produce all non-privileged custodial emails hitting the term "MyChem" if Illumina would withdraw the subpoena. Dkt. 313 at 4. Illumina refused that offer and moved to compel. *Id.* The Court agreed with CGI. *Id.* The Court rejected Illumina's demand for more than CGI had offered, and explained in detail why the additional documents Illumina sought from MyChem were not relevant to any allegations in the case. *Id.* at 6-8.

Even after trial, Illumina sought additional discovery, moving for another deposition of CGI. Dkt. 573. The Court denied that motion as well. Dkt. 584. Although Illumina's motion was rife with accusations of inconsistency, even falsity, the Court's careful consideration of the facts revealed that there was no showing that CGI's challenged discovery response was either false or incomplete. *Id.*

Illumina's complaints concerning CGI's discovery conduct should be considered in the context of the totality of the extensive discovery. Those complaints fall generally into five categories (i) Dr. Romesberg's failure to answer deposition questions relevant to his credibility; (ii) CGI's claims of work product protection concerning design around efforts, (iii) CGI's opposition to the depositions of three apex witness, (iv) CGI's privilege claims, and (v) a hodge-podge of issues where CGI agreed to Illumina's discovery demands after Illumina served discovery letters without having met and conferred. None of CGI's behavior was unreasonable, whether considered individually or collectively.

Illumina begins its discussion of discovery issues with Dr. Romesberg's deposition, but it misstates the purpose of CGI's questioning. Dkt. 575-4. During Dr. Romeberg's deposition, Illumina's counsel instructed him not to answer questions that went directly to his credibility, as CGI's counsel explained on the record at the time. CGI II Dkt. 476-6 at 477-483. There was

1   nothing abusive or unreasonable in CGI posing questions related to the credibility of a critical

2   witness, such as Illumina's technical expert. In fact, the jury instructions support that testimony

3   can be viewed in light of any "factors that bear on believability." Tr. at 1125:18-1126:4. The jury

4   was also instructed "if you decide that a witness has deliberately testify untruthfully about

5   something important, you may choose not to believe anything that witness said." *Id.* at 1126:13-

6   15. Dr. Romesberg stated that in the academic world, the issue on which CGI tried to question

7   him, whether writing a recommendation for a person and not informing the recipient that there was

8   more than a professional relationship for the person being recommended, was not truthful, honest,

9   and ethical for the drafter. CGI II Dkt. 476-6 at 475:8-20. Illumina's instructions not to answer

10  questions that did not implicate privilege were contrary to black letter law, and the appropriate

11  next step in light of such instructions was for Illumina to seek a protective order as it said it would

12  do. *See Detoy v. City & Cty. of San Francisco*, 196 F.R.D. 362, 365 (N.D. Cal. 2000); *Biovail*

13  *Labs., Inc. v. Anchen Pharm.*, *Inc.*, 233 F.R.D. 648, 653 (C.D. Cal. 2006). The fact that the Court

14  determined that the resulting motion practice was a motion to compel, as opposed to Illumina

15  moving for a protective order, and therefore denied it on procedural grounds as untimely, does not

16  alter the merits of CGI's position. CGI II Dkt. 479

17          The second complained-about category of discovery concerned CGI's design-around

18  efforts, in particular its assertions of work product protection and/or privilege over information

19  concerning those efforts. Dkt. 575-4 at 17. Here, the Court did not find CGI's position "clearly

20  unfounded" as Illumina asserts. *Compare* Dkt. 575-4 at 17 with CGI II Dkt. 221 at 5. Rather, the

21  Court expressly recognized that "actual attorney-client communications about a design around are

22  still privileged, and an attorney-written memo with thoughts and impressions about a design

23  around is still work product." CGI II Dkt. 221 at 5. The Court went on to clarify that its holding

24  was "simply that Defendants cannot declare off limits the entire subject matter of designing

25  around Illumina's patents." *Id.* As evidenced by the Court's decision, it is necessary to draw a

26  careful distinction between materials related to design-arounds that reveal privilege or work

27  product, and those that reveal only the facts of what has been done. *Id.* at 4-5. CGI's

28

understandable caution was not discovery misconduct, particularly when the disclosure of privileged information risks waiver.

Illumina's third complaint concerns depositions of three top level executives, asserting that CGI "improperly resisted" those depositions. Dkt. 575-4 at 17. However, CGI did nothing more than invoke the apex witness doctrine to try to avoid these disruptive, and in CGI's view, irrelevant depositions. Dkt. 265-4 at 4-6. That the Court ultimately disagreed with CGI does not make CGI's invocation of a well-established doctrine "improper."

Illumina also faults CGI for the timing of one of those depositions during the global pandemic. Dkt. 575-4 at 18. This should have been a simple issue. Dr. Wang is located in mainland China, and was therefore required to travel outside of mainland China to sit for his deposition. As the parties were attempting to set a date for Dr. Wang's deposition, new COVID-19 cases were confirmed in Macao, and the Macao government announced new safety measures, including heightened safety measures at the border with mainland China. CGI II, Dkt. 459, Ex. 2. As Dr. Wang testified at his deposition, not only were there COVID-related difficulties with crossing the border out of mainland China, but there was also the possibility of a 14 day quarantine when trying to return. Ex. 4 (J. Wang Dep. Tr.) at 32:11-22. In light of this, CGI sought a brief extension of the time in which to complete Dr. Wang's deposition, but was unable to come to agreement with Illumina, resulting in CGI's motion for an extension of time for the deposition. CGI II, Dkt. 459.

It bears noting that, the fact that the parties were attempting to schedule Dr. Wang's deposition well after the close of discovery, and at a time when there was a resurgence of COVID-19 cases in Macao, was entirely by Illumina's choice. Illumina wanted resolution of the outstanding privilege disputes before deposing Dr. Wang. Dkt. 575-4 at 18; CGI II Dkt. 398 at 1. However, as it turned out, the resolution of those disputes made no difference. Illumina's assertion that Judge Hixson's resolution of the privilege dispute "resulted in the production of over 50 improperly withheld documents" is incorrect. Dkt. 575-4 at 18. Judge Hixson's Order rejected only six, not fifty, of CGI's privilege claims, and in Judge Hixson's words "those concerned small redactions that did not significantly alter the content of the documents." CGI II Dkt. 417 at 7.

1       As illustrated by Judge Hixson's order, CGI behaved entirely properly with respect to

2   Illumina's fourth category of complaints, CGI's privilege claims. To begin, it is necessary to

3   clarify some facts. CGI suggested the April 21, 2021 exchange of privilege logs that appears in the

4   Court's April 7, 2021 Order. Dkt. 327 at 2; Dkt. 330. As of April 7, Illumina had requested *in*

5   *camera* review of six clawed-back documents (Dkt. 312), and the Court ordered CGI to serve a log

6   for those six documents before the agreed deadline for serving the complete log. Dkt. 330.

7       Illumina also complains of the content of CGI's log, asserting that it was "so deficient"

8   that the Court found it necessary to conduct *in camera* review of 20 documents. Dkt. 575-4 at 18.

9   Yet, CGI's purportedly "deficient" descriptions in its privilege log were no different than

10   Illumina's descriptions in its own privilege log. CGI II Dkt. 362-4. Moreover, Illumina is

11   complaining about supposed deficiencies for a miniscule fraction of the more than 3,000 entries in

12   CGI's privilege logs. CGI II Dkt. 364-12.

13       Illumina's arguments concerning CGI's privilege claims repeat their inaccurate assertion

14   that "the Court overruled BGI's claims of privilege on over 50 improperly withheld documents."

15   Dkt. 575-4 at 19. Rather, the Court overruled CGI's privilege claims concerning the redacted

16   portions of only *six* documents. CGI II Dkt. 417 at 7. The Court also declined Illumina's request

17   for additional in camera review, explaining that "[f]or the documents the Court has reviewed in

18   camera, the Court sustained Defendants' privilege claims about three quarters of the time, so there

19   is no indication of a significant pattern of misusing the privilege. Likewise, while the Court

20   rejected one quarter of the privilege claims, those concerned small redactions that did not

21   significantly alter the content of the documents. Further, the number of briefs that were filed in

22   connection with this dispute indicates that this privilege dispute has metastasized into expensive

23   and unproductive satellite litigation that is best brought to an end." *Id.* CGI should not bear the

24   cost of Illumina's expensive and unproductive satellite litigation that resulted in the Court

25   rejecting a small fraction of CGI's privilege claims, all of which involved "small redactions that

26   did not significantly alter the content of the documents."

27       Finally, the lack of any actual discovery misconduct is highlighted by Illumina's inclusion

28   of its fifth category of complaints—issues that the parties resolved without the Court's

intervention. Illumina is incorrect that there was any "adamant refusal" to cooperate on these issues. On March 24, two days before the close of fact discovery, responded to an email from CGI asking for a meet and confer by requesting that a number of additional items be added to the agenda. Ex. 5 (March 24, 2021 email from M. Root to A. Naravage). The parties then exchanged a series of emails seeking to schedule a meet and confer on issues raised by both sides. *Id.* Illumina then served their portions of multiple letter briefs on March 26, just two days after the email raising the issues and ***before*** the parties had met and conferred. *Id.*; Dkt. 575-4 at 19. CGI can hardly be faulted for not addressing these complaints from Illumina before the parties had even discussed them.

The totality of the circumstances here show that this was a hard-fought case between competitors, in which CGI advanced arguments that were supported by facts and law. Such good faith zealous advocacy is not exceptional.

## IV.   <u>THIS CASE DOES NOT WARRANT AN AWARD OF ENHANCED DAMAGES</u>

CGI's conduct in this case was far from the actions "of a pirate" as would be necessary to justify enhanced damages. CGI never launched, and never sought to launch, its accused StandardMPS chemistry in the United States. And, CGI had strong non-infringement and invalidity positions with respect to the patents asserted against the innovative CoolMPS chemistry. Under the circumstances, even if the jury's willfulness finding stands, there is no basis for enhanced damages.

### A.   The Jury's Willfulness Finding Is Not a Basis for Enhanced Damages

As discussed in CGI's JMOL, the Court should grant JMOL of no willfulness. Even if the willfulness verdict stands, a finding of willfulness does not require an award of enhanced damages. *See Halo*, 579 U.S. at 106 ("[N]one of this is to say that enhanced damages must follow a finding of egregious misconduct."). The willfulness determination also does not "demonstrate[] that this case is egregious," as Illumina contends. Dkt. 575-4 at 20. Consistent with Federal Circuit authority, the jury was instructed that "[t]o prove willful infringement, Illumina must persuade you that it's more likely true than not true that defendants intentionally ignored or recklessly disregarded a valid claim of Illumina's asserted patents." Tr. at 1135:10-14; *Eko Brands, LLC v.*

1   *Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020) ("Under *Halo*, the

2   concept of 'willfulness' requires a jury to find no more than deliberate or intentional

3   infringement."). Enhanced damages, in contrast, are reserved for conduct that is "willful, wanton,

4   malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a

5   pirate." *Halo*, 579 U.S. at 103-04.

6       **B.**    **The *Read* Factors Weigh Against An Award of Enhanced Damages**

7       There is significant overlap in the *Read* factors evaluated for enhanced damages and the

8   analysis underlying the exceptional case analysis—such as lack of copying (*Read* No. 1),

9   knowledge of the patent (*Read* No. 2), behavior in litigation, (*Read* No. 3) and closeness of the

10  case (*Read* No. 5). Courts deny enhanced damages under these facts. *Power Integrations, Inc. v.*

11  *Fairchild Semiconductor Int'l, Inc.*, No. 09-cv-05235-MMC, 2017 WL 130236, at *4-5 (N.D. Cal.

12  Jan. 13, 2017); *Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-cv-03999-BLF, 2016 WL 3880774, at

13  *15-17 (N.D. Cal. July 18, 2016); *VirnetX Inc. v. Apple Inc.*, No. 12-cv-00855-RWS, 2018 WL

14  10048706, at *21 (E.D. Tex. Aug. 30, 2018) ("A testament to the closeness of the case is the fact

15  that the jury deliberated for over five hours between the two phases of the case."), *aff'd in part,*

16  *rev'd in part on other grounds, vacated in part on other grounds*, 792 F. App'x 796 (Fed. Cir.

17  2019).

18      With respect to *Read* No. 4 (CGI's size and financial condition) This factor is neutral. Both

19  companies are well-funded competitors.

20      With respect to *Read* No. 6 (duration of accused conduct), this weighs against

21  enhancement because since 2018, CGI's work in the U.S. has been focused on CoolMPS (Tr. at

22  595:9-13), a product that was not even accused of infringing the '537 patent, the only patent for

23  which Illumina presented evidence concerning CGI's awareness.

24      With respect to *Read* No. 7 (remedial action by CGI), this factor weighs against

25  enhancement. Illumina argues that CGI announced the launch "of its infringing products in the

26  United States scheduled for April 2020—over nine months after the complaint was filed." Dkt.

27  575-4 at 24, citing TX1129; but that ignores that the launch was CGI's CoolMPS products. The

28  complaint relied upon by Illumina, however, alleged infringement of the '537 and '200 patents—

the two patents that Illumina never asserted against CoolMPS. This litigation has largely vindicated CGI's well-founded belief that CoolMPS does not infringe any valid claim of any Illumina patent.

With respect to *Read* No. 8 (motivation for harm), this factor weighs against enhancement. Illumina incorrectly asserts that CGI attempted to launch "products in the U.S. based on technology copied from Illumina." Dkt. 575-4 at 24. As described above, there is no evidence of copying. And CGI sought to launch only CoolMPS in the United States. Marketplace competition is not actionable "harm." *Power Integrations*, 2017 WL 130236, at 5 (noting that seeking to gain a business advantage is not "motivation to harm" (citation omitted))

With respect to Read No. 9 (attempts to conceal), this factor weighs against enhancement. Illumina relies on documents from 2015 and 2016 concerning international activities around the StandardMPS chemistry to try to suggest that CGI attempted to conceal "misconduct." Dkt. 575-4 at 25. Not so. The email concerns an "international launch" of a product, not a concealment of it. TX0713. Illumina cannot seriously contend that CGI was trying to conceal its conduct when planning an "international launch" of the BGISEQ-500 product.

When CGI was planning to launch the new, CoolMPS chemistry in the U.S., CGI published an article describing CoolMPS (CGI II Dkt. 1-52), followed by a public announcement of its intent to launch in the U.S. TX1129. It concealed nothing.

Illumina's consistent blurring of CGI's activities concerning StandardMPS and CoolMPS should alone defeat its request for enhanced damages. When the facts are considered, none of the *Read* factors suggests the kind of "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, or flagrant" conduct necessary for enhancement. *See Halo*, 579 U.S. at 103-04.

As indicated in the text of 35 USC § 284, enhancing damages is discretionary. The Supreme Court has explained that discretion must be tethered to "sound legal principles" and enhanced damages "are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior." *Halo*, 579 U.S. at 103 (citation omitted). As the foregoing makes clear, CGI prevailed on many issues in this closely contested litigation. Indeed, the patent system benefits from fulsome litigation between

competitors. And CGI behaved with diligence: as described above, it formed good faith beliefs, mounted reasonable defenses—many of which succeeded—and only offered CoolMPS for sale in the U.S.  In *Presidio Components, Inc. v. American Technical Ceramics Corp.*, 875 F.3d 1369 (Fed. Cir. 2017), after a jury finding of willful infringement, the district court declined to award enhanced damages, which the Federal Circuit affirmed. *Id.* at 1382-83.  Even though the jury rejected the defendant's defenses, the district court concluded the case "was a garden-variety hard-fought patent case." *Id.* (quotation marks omitted). The same result should occur here—Illumina's request for an exceptional case finding and enhanced damages should be denied.

## V.    ILLUMINA'S MOTION IS PREMATURE

Illumina's motion for fees is premature. A motion for fees may be filed no later than fourteen days after entry of judgment, see Fed. R. Civ .P. 54(d)(2)(B); Civil L.R. 54-5, but there has been no entry of judgment. *See Use Techno Corp. v. Kenko USA, Inc.*, No. 06-cv-02754 EDL, 2007 WL 3045996, at *2 (N.D. Cal. Oct. 18, 2007); *Ondersma v. Metro. Life Ins. Co.*, No. 06-cv-0258 MMC, 2007 WL 4371422, at *9 (N.D. Cal. Dec. 12, 2007) ("To the extent plaintiff seeks fees and costs, the request is premature because judgment has not been entered."). This motion should not be considered until the parties' pending JMOL motions are resolved and judgment entered.

DATED:  February 1, 2022                     Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By _/s/ David Bilsker_
David Bilsker
Attorneys for Defendants BGI Genomics Co., Ltd., BGI Americas Corp., MGI Tech Co., Ltd., MGI Americas Inc., and Complete Genomics, Inc.